[Civ. No. 6701. Third Dist. Oct. 26, 1942.]

BERTHA WOOD, as Administratrix, etc., Respondent, v. EDWARD PEFFER, Appellant.

Gumpert & Mazzera and C. H. Hogan for Appellant.

Johnson & Curtright, P. H. Johnson, C. K. Curtright and John R. Cronin for Respondent.

PAULSEN, J. pro tem.—Unfair competition. Plaintiff recovered judgment for $923.61, because of profits diverted from her business, and was granted an injunction. Defendant prosecutes this appeal from said judgment. For convenience, the parties will be referred to herein as plaintiff and defendant.

There is practically no conflict in the evidence, and the facts may be summarized as follows:

The plaintiff, Bertha Wood, ever since the 17th day of April, 1939, has been the administratrix of the estate of her late husband, H. L. Wood, who, during his lifetime, conducted, at 2947—35th Street, in the city of Sacramento, a profitable household and electric appliance business. After the death of H. L. Wood on April 2, 1939, plaintiff applied for letters of administration of his estate, and secured an

order of the court authorizing her to conduct the business of the decedent as a part of her duties as administratrix.

Included in the assets of the estate were sixty-four Hotpoint electric refrigerators. Of this number, thirty-two were held under a trust receipt, upon which General Electric Contracts Corporation was the legal owner. Some of the refrigerators were "on the floor" of decedent's place of business, but most of the thirty-two owned by General Electric Contracts Corporation were stored in a warehouse in Sacramento. For reasons that need not be recited here, General Electric Contracts Corporation exercised its right to possession of the refrigerators under its trust receipt, and they thus passed from the control of the Wood Estate, and never thereafter returned to its control or possession.

On June 10, 1939, the administratrix terminated her lease of the store premises, but left some of the stock, including several refrigerators, with the new occupants, to be sold for the estate. She then continued to dispose of the remaining stock from her home in Sacramento.

On the 24th day of June, 1939, the defendant was, and for a number of years prior thereto had been, conducting a general household furnishing business in the city of Stockton, selling, among other things, electric refrigerators. He also owned and operated, in connection with his business, a radio broadcasting station.

On the 22nd day of June, 1939, representatives of the Electric Kitchen Appliance Company of San Francisco, which had gained control of twenty-seven Hotpoint Electric Refrigerators, repossessed from the stock belonging to the estate of H. L. Wood, deceased, sold that number to defendant. The salesman for Electric Kitchen Appliance Company informed defendant that the refrigerators thus sold constituted the entire stock of Hotpoint electric refrigerators of the late H. L. Wood of Sacramento, and defendant made no investigation whatever to determine the correctness of that statement.

On the 24th day of June, 1939, defendant caused to be broadcast over his radio station the following announcement:

"Big Sacramento stock Hotpoint refrigerators sacrificed to Peffer. Entire stock late W. L. Wood, Sacramento dealer. The entire Hotpoint electric refrigerator stock of the late W. L. Wood of Sacramento was sacrificed to Peffer this week. The Wood Company in Sacramento has sold hundreds of Hotpoints. Wood was one of Hotpoint's best dealers, with

always large stocks. The offer came to Peffer this week—and Peffer cash quickly closed the deal. Hotpoint electric refrigerators are all new, all 1939 styles, all sizes, and the deal is so good that Peffer can sell while they last the family-sized Hotpoints at just $124.50; larger sizes at corresponding price cuts. Standard and DeLuxe Hotpoints in this deal just in time for opening week of great Peffer summer sales, but they won't last long even though there are many in this Peffer deal, because Hotpoints have never before been at such bargain prices. And as with all new electric refrigerators, Peffer is giving Emerson Room Coolers, and Royal Electric Fans absolutely free. Pick any Hotpoint, pay $9.50 down, then as low as $1.25 weekly. No interest, no finance cost, no carrying charges. All Hotpoint electric refrigerators covered by factory and Peffer five-year protection plan. To any home by Peffer in 200 miles.''

Said advertisement was announced over the radio not more than three times during the latter part of June, and was never repeated thereafter. Defendant testified that the name ''W. L. Wood,'' as used in the broadcast, was a mistake, and that he intended to refer to the decedent.

The defendant sold twenty-four of said refrigerators between the 22nd day of June and some date in the early part of September, 1939. The other three were retained by him, and, according to his testimony, were used on his ranch. No sales were made in the city of Sacramento.

Plaintiff instituted this action upon the theory of unfair or unlawful competition in business, basing her claim entirely upon the fact that defendant caused said announcements to be made over his radio broadcasting station.

Defendant's first contention is that the record shows without doubt that plaintiff was not actually engaged in business, and is therefore in no position to maintain such an action.

The court found that the ''plaintiff has been, and now is conducting, carrying on, and operating the said business of said decedent; that plaintiff, as administratrix as aforesaid, has possession of the stock of goods and other assets of said business of said decedent, and has exposed and offered, and is exposing and offering the said stock of goods for sale at retail in the City of Sacramento, County of Sacramento, State of California.'' The court further found that the plaintiff, as administratrix, did have on hand and in her possession Hotpoint electric refrigerators of, or belonging to the estate

of said decedent which she was then offering and exposing for sale at retail.

Defendant contends that such findings are not supported by the evidence. Plaintiff testified that subsequent to the death of her husband she continued to operate the business under the order of the court; that at the time of the filing of the complaint herein, she was so operating the business and was attempting to sell the stock on hand; that she still had several of the refrigerators on hand; that she was not running the business from the store, but was still trying to sell the stock. She testified on cross examination: "I think I operated it personally, myself, until the 10th day of June; after that I rent-leased or rented the building that we were occupying to another party who was going into business, and with the arrangements that they were to handle my merchandise until it was all sold." There was a conflict in the evidence as to the exact number of refrigerators remaining for sale, the lowest estimate of plaintiff being "four or more."

The record fails to disclose the exact circumstances under which plaintiff left the refrigerators with her lessee for sale, but it is apparent that she did not remain at the former place of business to supervise sales, and that the premises were operated, in part at least, for the benefit of the lessee. However, the testimony shows clearly that four or more refrigerators of the decedent were still being offered for sale, and in our opinion it is immaterial whether or not the sale was being personally conducted by plaintiff, or through an agent or employee, or whether or not plaintiff was attempting to dispose of the assets of said estate at the former place of business of her husband, or from her home. She was still in a position to suffer from any act of unfair competition in the sale of such assets, and the public could still be deceived concerning the ownership thereof. The evidence amply supports the findings of the trial court in these particulars.

Defendant further asserts that in order for plaintiff to prevail in this action it was incumbent upon her to allege and prove actual business competition between her and defendant. It is argued that there is nothing in the record to indicate that the plaintiff or her husband, in his lifetime, had ever sold, or attempted to sell, merchandise of any kind in or near the city of Stockton, or that the defendant had ever sold any merchandise of any kind in or near the city of Sacramento. Further, that notwithstanding the defendant's

broadcast, there was no evidence to show that he actually made any sales in the city of Sacramento.

It is true that the complaint contained no allegation of actual business competition between the parties. However, defendant did not demur upon that ground, and at the trial made no objection to evidence which, as hereinafter stated, clearly proved the existence of such competition.

In support of his contention defendant cites *Beechnut Packing Co.* v. *P. Lorillard Co.*, 7 F.2d. 967; *Chapin-Sacks Mfg. Co.* v. *Hendler Creamery Co.*, 231 F. 550; *Goodhousekeeping Shop* v. *Smitter*, 254 Mich. 592 [236 N.W. 872]; *National Grocery Co.* v. *National Stores Corp.*, 95 N.J.Eq. 588 [123 A. 740].

In some respects these cases represent the minority opinion in the United States, and at least one of them recognizes the rule that it is not always necessary to prove actual market competition where the purpose of the action is to secure injunctive relief. The Beechnut Packing company case, *supra*, is directly opposed to defendant's contentions. The court there said: "We are aware, however, that equity may be invoked without market competition. Emphasis should be placed on the word 'unfair' rather than 'competition.' If by unfair and fraudulent means the plaintiff is injured and the public deceived, equity will enjoin, whether the injury comes through competition or in some other way."

The foregoing quotation is a recognition of the majority view set forth more fully in 63 C.J., 389, as follows:

". . . it has been held, that there must be actual competition before there can be any unfair competition, and that there cannot be competition unless there is something to compete with. However, the tendency of the courts has been to widen the scope of protection in the field of unfair competition. They have held that there is no fetish in the word 'competition,' and that the invocation of equity rests more vitally on the element of unfairness. Accordingly, it is now held that the doctrine of unfair competition is not confined to cases of actual market competition between similar products of the parties, but that it extends to all cases in which one party fraudulently seeks to sell his goods as those of another; that it does not necessarily involve unfair competition in the sale of goods, but the unfair appropriation and use of a competitor's mark, with the intention to profit in the sale of goods of a related character. So, without regard as to whether there is actual market competition between the parties for the same

trade, it is sufficient if the unfair practices of the one will injure the other. . .''

And in line with the foregoing statement, our own Supreme Court has held that so far as injunctive relief is concerned, it is not necessary that the parties be in actual competition if confusion and deceit will result from the acts of the defendant. (*Academy of Motion Pictures etc.* v. *Benson,* 15 Cal. 2d 685 [104 P.2d 650].)

We are of the opinion, moreover, that actual competition was proved. It was shown by the evidence that the cities of Sacramento and Stockton are about fifty miles apart, and it is a matter of common knowledge that shoppers, especially those in search of expensive articles, such as electric refrigerators, are accustomed in recent years to travel considerable distances to secure the best bargains, especially in fields where sales are widely and aggressively advertised, and where merchants are offering reduced prices and exceptional terms. The record discloses that at the time plaintiff was seeking to dispose of her refrigerators, defendant's broadcast stated, in effect, that plaintiff had no refrigerators to sell; that he had purchased her entire stock; that he was selling them at a reduced price with special premiums; that he would make free deliveries within a distance of two hundred miles of his store; and this, of course, included the whole city of Sacramento and its environs, a distance at least one hundred fifty miles in any direction from the place where plaintiff was attempting to dispose of the stock. This constituted the keenest and most unfair kind of competition.

It is further argued that the court was not justified in granting an injunction because there was no proof of fraud, and that inasmuch as defendant had testified that all the refrigerators had already been sold, the transaction was completed before the injunction was granted.

Section 3369 of the Civil Code declares that unfair competition includes, among other things, ''unfair or fraudulent business practice, and unfair or misleading advertising.''

In *Pohl* v. *Anderson,* 13 Cal. App. 2d 241 [56 P.2d 992], the court quotes with approval the following extract from 63 C.J., 414:

''No inflexible rule can be laid down as to what conduct will constitute unfair competition. Each case is, in a measure, a law unto itself. Unfair competition is a question of fact.

. . . The universal test question is whether the public is likely to be deceived.''

So far as injunctive relief is concerned, it was not necessary to prove that the conduct of defendant was fraudulent. It will be noted that while the Beechnut Packing Company case, *supra,* and some of the other cases, speak of ''unfair *and* fraudulent'' competition, section 3369, *supra,* mentions these elements in the disjunctive, thus providing for injunctive relief where the conduct is unfair, even though there is no element of fraud. See, also, *Dodge Stationery Co.* v. *Dodge,* 145 Cal. 380 [78 P. 879]; *Hoover Co.* v. *Groger,* 12 Cal.App. 2d 417 [55 P.2d 529]; *Miskawaka Rubber Co.* v. *Woolen Mfg. Co.,* 119 F.2d 316.)

That injunction is a proper remedy in cases of this kind is beyond dispute. (Civil Code, sec. 3369; *Morton* v. *Morton,* 148 Cal. 142 [82 P. 664, 1 L.R.A.N.S. 660]; *Dodge Stationery Co.* v. *Dodge, supra; Weinstock-Lubin Co.* v. *Marks,* 109 Cal. 529 [42 P. 142, 50 Am.St.Rep. 57, 30 L.R.A. 182].) The record shows that three refrigerators remained in defendant's possession at the time judgment was rendered. This fact alone negatives the argument that the transaction was necessarily completed, and that defendant no longer possessed the means of continuing in his course of conduct. Where a guilty party retains the means of so continuing his transgressions, a court is not required to accept his statement that he no longer intends to do so.

 It is next argued that plaintiff was not entitled to prevail because there was no evidence to prove that defendant's broadcasting station was sufficiently powerful to be heard in Sacramento, and therefore no proof that the broadcasts could have injured plaintiff. We have already expressed the view that a business such as that conducted by plaintiff does not necessarily draw its patronage from the area within the limits of the city where it is located, and the wording of defendant's broadcast clearly indicated that defendant regarded his field of operations as including the city of Sacramento and the area for many miles around it. He expressly offered to make free deliveries within two hundred miles of his place of business. It is inconceivable that defendant would have included such terms in his broadcast if his station had been too weak to be heard by the persons within the area included in his offer. It is a logical inference from these facts that the broadcast could have been heard in the area served by plaintiff.

█ The court awarded plaintiff the sum of $923.61—the amount of the profits realized by defendant from the sales of the refrigerators. In so doing it followed the rule prescribed in *Modesto Creamery Co.* v. *Stanislaus Creamery Co.*, 168 Cal. 289 [142 P. 845], and *Banzhaf* v. *Chase*, 150 Cal. 180 [88 P. 704]. Defendant now contends that profits were not recoverable under the circumstances of this case, and that there was no evidence to justify the allowance of this amount as an award of damages.

It is said in the Modesto Creamery Case, *supra*, with reference to trademarks, that—

"In contemplation of law, such profits are diverted from plaintiff, being obtained through the improper invasion of plaintiff's trade rights. Entirely apart from the question of actual damage, the owner of a trade-mark is entitled to recover from an infringer the profits realized by the latter from sales under the simulated trade-mark."

It is then held that the rule thus announced applies also to cases of unfair competition. In each of those cases, and others of similar import, there was proof of actual fraud or intent to divert the business of plaintiff by the unlawful means employed. The parties to those actions were going con cerns that carried on a continuing business with constantly replenished stocks of merchandise. In the instant case there is no evidence of a deliberate design to injure the business of plaintiff, or of a fraudulent intent upon the part of defendant. He was informed by the salesman with whom he negotiated for the purchase of the refrigerators that they constituted the entire stock of the Wood estate, and there is no evidence that he persisted in his broadcasts when the true facts became known to him. It is said in *McLean* v. *Fleming*, 96 U.S. 245 [24 L.Ed. 828], that equity constantly refuses, for want of fraudulent intent, the prayer for an accounting of profits, although the right to an injunction against the infringer is acknowledged. In Nims on Unfair Competition and Trade-marks, page 1078, the rule is laid down that "an accounting will not be ordered where the infringing party acted innocently and in ignorance of the plaintiff's rights, provided such party stops his illegal practice after he discovers the truth." See, also, *Liberty Oil Corp.* v. *Crowley M. & Co.*, 270 Mich. 187 [258 N.W. 241, 96 A.L.R. 645], and Annotation, 96 A.L.R. 651.

The defendant's argument against the allowance of profits

is further fortified by the fact that obvious inequities would result from such a rule if applied to cases of this peculiar nature. Plaintiff was not operating a business in the ordinary sense of that term. She had about four refrigerators to sell before closing out that line, and she could not possibly have suffered a diversion of profits equal to those realized by defendant. She did not show that she had been unable to sell the refrigerators which she had on hand, or that any loss of profit on their sale had been suffered. In this respect the instant case differs materially from the cases in which profits have been deemed to be diverted. In *Straus* v. *Notaseme Co.*, 240 U.S. 179 [36 S.Ct. 288, 60 L.Ed. 590], the court held that in unfair competition cases the defendant is not always chargeable with profits as a matter of right, and that the analogy between these cases and those growing out of trade-mark infringements is not always complete, and the same rules cannot always be applied. In *J. C. Penney Co.* v. *H. D. Lee Mercantile Co.*, 120 F.2d 949, it is declared that in a case of unfair competition the court should endeavor to adapt its relief to the general equities of the situation as nearly as is possible under the circumstances, but no evidence of damage, other than defendant's profits, was offered in the case.

The part of the judgment granting an injunction is affirmed, and the part thereof awarding profits to plaintiff is reversed, costs of appeal to be borne by each party.

Thompson, J., and Adams, P. J., concurred.