[Civ. No. 14717. First Dist., Div. One. Sept. 13, 1951.]

MacSWEENEY ENTERPRISES, INC. (a Corporation), Respondent, v. J. C. TARANTINO et al., Appellants.

Joseph L. Alioto and Walter F. Calcagno for Appellants.

Bernard B. Glickfeld for Respondent.

PETERS, P. J.—Plaintiff, MacSweeney Enterprises, Inc., is a corporation owned and directed by J. Eugene McAteer and Daniel J. Sweeney, Jr. The corporation owns and operates "Tarantino's," a well-known San Francisco restaurant located on Fisherman's Wharf. The defendant Bell Smoked Fish Company is a corporation owned and operated by five members of the Tarantino family, several of whom are also individual defendants. The corporate defendant is engaged in the business of packing and marketing fish and in manufacturing and distributing certain allied products. All such products for many years and now, except the sauce here involved, have been marketed under the trade name of "Tara Bell."

A few months before the filing of this complaint the defendants placed on the market a cocktail sauce, labelled "Tarantino's Cocktail Sauce." The word "Tarantino's" on this label is the singular possessive as is the name of the restaurant, and is in a form of script almost identical with that used by plaintiff to advertise its restaurant. Plaintiff does not manufacture for sale a cocktail sauce but, on the theory that purchasers of the sauce would believe it was being marketed by the restaurant, brought this action for an injunction and for damages. The trial court denied damages, but perpetually enjoined the defendants from using the name "Tarantino's," or any word similar to it, on the labels of the cocktail sauce. Defendants appeal.

The facts are not in substantial dispute. Tarantino's Restaurant is located at 206 Jefferson Street on Fisherman's Wharf. About May of 1944 appellant J. C., and Peter Tarantino leased those premises from the State of California. All property on the wharf is owned by the state. The two lessees secured the premises with the idea in mind of opening a restaurant there. The premises had never been used for this purpose before this time, nor had any of the Tarantinos ever been in the restaurant business. A partnership between the two Tarantinos was organized for this purpose, and J. Eugene McAteer was hired as manager of the proposed restaurant.

McAteer suggested to the partners, and it was agreed, that the new restaurant would be called "Tarantino's." Certain contracts were entered into by the partnership in preparation for the operating of a restaurant on the premises, but, before the restaurant was opened, the Tarantinos decided that they did not wish to continue. On January 23, 1946, the two partners sold out to Daniel J. Sweeney, Jr., who apparently was acting not only for himself but also for McAteer. An agreement was entered into whereby the two Tarantinos transferred to Sweeney their interests in the proposed restaurant and in all contracts executed in connection therewith. The contract contains this clause: "The transfer of their total interest in the partnership by first party [J. C. Tarantino] and second party [Peter Tarantino] is intended to give to third party [Daniel J. Sweeney, Jr.], in addition to all other rights, the use of the name 'Tarantino's'." This contract is important only for the purpose of showing the derivation of the name of the restaurant and of the legal right of plaintiff to use the name. It gave plaintiff no rights at all against the corporate defendant or against several of the individual defendants who were not parties to it.

In April of 1946 Sweeney and McAteer, as partners, opened the restaurant under the name "Tarantino's." In 1947 the business was incorporated under the name of "MacSweeney Enterprises, Inc.," Sweeney and McAteer being the sole stockholders. The corporation operates the restaurant under the name "Tarantino's." In connection with the restaurant a gift shop is operated, but the corporation does not manufacture for sale any sauce of any kind.

From the beginning of operations the restaurant has been successful. It has acquired a national and even an international reputation. In 1948 it did a gross business of almost three-quarters of a million dollars. It receives mail from all over the world, about 50 per cent of which is simply addressed "Tarantino's, Fisherman's Wharf, San Francisco." Over the past three and a half years the corporation has spent between $50,000 and $60,000 in advertising. In all such advertising, on its letterheads, and on the restaurant, the name "Tarantino's" is featured, and, from the beginning, a particular type of script has been used for this purpose.

The Bell Smoked Fish Company, among other things, manufactures and distributes several sauces and dressings. For example, for many years it has manufactured a Tartare Sauce and a Louis Dressing. These and other products of the

company have been put out under the trade name "Tara Bell," which name is conspicuously displayed on the labels. These labels contain no reference to Fisherman's Wharf, although the company's office is located there, and make no mention of the Tarantino name.

About July of 1949 the Bell company started to manufacture and to market a cocktail sauce. This is put out under the name "Tarantino's Cocktail Sauce," which designation is prominently displayed at the top of the label. The word "Tarantino's" is printed in script practically identical to that used by the restaurant. The singular possessive form of the name was used, identical with that used by the restaurant, although there were five Tarantinos active in the Bell company. No explanation of why the plural possessive was not used was given. At the bottom of the label appears "Bell Smoked Fish Co., Fisherman's Wharf, San Francisco 9, California." Prior to putting out this sauce the Bell company had never put out any product under the name "Tarantino's."

This cocktail sauce first came to the attention of McAteer about September of 1949 after many of the restaurant customers had told him that they had purchased "some of our sauce," or asked him if it was the restaurant's sauce. McAteer thereupon called upon J. C. Tarantino who informed him that the name had been selected upon the advice of counsel. McAteer consulted his attorney, and this lawsuit resulted.

J. C. Tarantino, one of the appellants, is president of the Bell company, and is also individually engaged in the business of buying fish livers. He has never engaged in business in San Francisco under the name "Tarantino's," and, as far as he knows, none of the other appellants has ever used that name in any business, except that some 10 to 15 years prior to the trial the Bell company had some placards printed requesting sportsmen to have their fish smoked at the Bell company. These placards had the name "Tarantino's" on them. The bills and invoices of the Bell company do not contain the name "Tarantino's." The invoices of J. C.'s individual business contain his own name, but not the name "Tarantino's." No bank accounts are carried in that name, nor has any advertising ever been done under that name (except for the sportsmen placards above mentioned) until the cocktail sauce was distributed. J. C. is thoroughly familiar with the restaurant operations of respondent, and, in fact, his company has sold fish products to respondent since it

opened for business. This appellant at all times here involved knew the type of script used by the respondent to advertise its restaurant.

J. C. further testified that the decision to put out the cocktail sauce was made at an informal meeting of the board of directors of the Bell company, at which time the board decided to put the sauce out under the family name. The board did not discuss the type of label to be used. Before manufacturing the sauce J. C. consulted his attorney about the propriety of using the family name, and, after being assured by the attorney that that was proper, ordered the labels prepared. He testified that he did not tell the printer what type of script to use, but left that to the printer's discretion, and, when the labels were prepared, approved them.

The name "Tarantino" is well known on Fisherman's Wharf. The father of the individual appellants operated on the wharf when it was known as "Meiggs Wharf," and at that time represented the local fishermen in selling their fish to wholesalers and retailers. Father Tarantino had an office in a building which, at that time, was the only structure on that side of the wharf. The name is a highly regarded Italian name, but it is not solely connected with the fish business, there being in San Francisco a Tarantino poultry business, a dry cleaners, and an electric company.

The gross volume of the Bell company averages around $750,000 a year, the sales of the cocktail sauce constituting only a small portion of this volume. J. C.'s individual liver business grosses about a million dollars a year.

The trial court found, among other things, that, prior to manufacturing the cocktail sauce, the defendants had never identified any of their products with Fisherman's Wharf, nor had they ever used the name "Tarantino's" on any of their products; that the actions of defendants in adopting the name and the form of label was "deliberate and calculated to deceive the public into believing that Plaintiff's restaurant is the manufacturer or preparer" of the cocktail sauce; that such actions have injured plaintiff's standing, reputation and good will; that "said actions of the Defendants created, and do create, confusion in the Plaintiff's business and does deceive the public into the purchase of a sauce preparation which is not that of the Plaintiff; that said actions of the Defendants have caused confusion and damage to the Plaintiff and injury to the public in general; that the actions of the Defendants have misled and caused patrons of the

Plaintiff to believe that the Defendants distributed the product made or prepared by the Plaintiff''; that defendants have marketed said cocktail sauce as that of plaintiff and have made a profit thereon based on the good will and reputation of the plaintiff. Based on these findings the defendants and their agents were ''perpetually commanded to desist and refrain, and are enjoined, directly or indirectly, or by any means or methods from using in any way, shape or manner upon or in connection with the marketing of the cocktail sauce for sea food, the name of 'Tarantino's,' and that said Defendants be perpetually commanded to desist and refrain from advertising and promoting in any manner or form the name 'Tarantino's' in connection with the cocktail sauce; and that Defendants be enjoined from using the name 'Tarantino's' or any name, phrase or device similar thereto on a labeling of said cocktail sauce and any form of printing simulating said name of 'Tarantino's.' ''

The findings that appellants deliberately adopted the name ''Tarantino's'' to designate their cocktail sauce, and deliberately simulated the script used by respondent, in an attempt to create the impression that it was sponsored by respondent and in order to capitalize on the good will and reputation of respondent, are amply supported and justified by the evidence. The legal question presented is whether a person may use his own name to advertise his product when he resorts to deception intended to confuse the buying public and which inevitably would injure another rightfully using the name. We have no hesitancy in holding that such deceptive practices may be enjoined even though such injunction deprives a person from using his own name to advertise his product.

■ Appellants argue that a family name is incapable of exclusive appropriation and cannot be monopolized. However true that may be as a general rule where fraud and deception are not employed, the principle has no application where those elements are present. This is demonstrated by the very cases cited by appellant. ■ One of the principal cases relied upon by appellant is *Tomsky* v. *Clark,* 73 Cal.App. 412 [238 P. 950]. At page 418 the court stated: ''Every man has the absolute right to use his own name in his own business even though he may interfere with and injure the business of another bearing the same name; *provided he does not resort to any artifice or do any act calculated to mislead the public as to the identity of the establishments or to pro-*

*duce injury to the other beyond that which results from the similarity of names.* [Citing cases.] *As just stated, equity will not allow a person to resort to artifice or contrivance in the use of his name as a result of which the public is deceived as to his business or products.* But in such case it is not the use of a man's own name that is condemned, it is the dishonesty practiced in the use of it. [Citing cases.]'' (Italics added.) (See, also, *Ida May Co.* v. *Ensign,* 20 Cal.App.2d 339 [66 P.2d 727]; *Dunston* v. *Los Angeles Van etc. Co.,* 165 Cal. 89 [131 P. 115]; *Alhambra Transfer etc. Co.* v. *Muse,* 41 Cal.App.2d 92 [106 P.2d 63]; *American Automobile Assn.* v. *American Automobile O. Assn.,* 216 Cal. 125 [13 P.2d 707, 83 A.L.R. 699]; *American Distilling Co.* v. *Bellows & Co.,* 102 Cal.App.2d 8 [226 P.2d 751]; *Jewish Publications, Inc.* v. *Gordon,* 91 Cal.App.2d 376 [205 P.2d 65, 206 P.2d 61].)

■ The use of one's own name is not absolute. In *Jackman* v. *Mau,* 78 Cal.App.2d 234 [177 P.2d 599], the dispute was over the names ''Jackman'' and ''Jackmau.'' The court stated (p. 238): ''Another element involved in cases of this character is the watchfulness of the law in protecting the public from the fraud or deceit resorted to by a pretender to falsely lead the buying public to believe that they are purchasing the goods of the merchant who, through a trade name and honest effort, has established a reputation and public demand for his product. [Citing a case.] And the fact that defendant was using his own name does not shield him from injunctive action if such use is calculated to cause confusion or to deceive. As was said in *Hoyt Heater Co.* v. *Hoyt,* 68 Cal.App.2d 523, 527 [157 P.2d 657], 'One must use his own name honestly and not as a means of pirating the good will and reputation of a business rival; and where he cannot use his own name without inevitably representing his goods as those of another he may be enjoined from using his name in connection with his business.' ''

There is a good discussion of this problem and a good collection of cases in Derenberg, ''Trade-Mark Protection and Unfair Trading'' beginning at page 361. As the author points out, there is an important distinction between the use of a family name as a firm name, and the use of such name in the trademark sense. ■ Here appellants are not attempting to use the challenged name as a company name, but are attempting to use it as a trademark. When that is coupled with deception, the court may and should enjoin.

■ Appellants next argue that no one could have been deceived by the challenged label. Anyone, so it is stated, of reasonable intelligence would know that the cocktail sauce was manufactured and marketed by the Bell company, and not by respondent. This, however, was a question of fact.

■ Proof of actual confusion is not necessary. If the facts support the conclusion that a purchaser of ordinary intelligence could reasonably be confused, that is all that is required. (*American Distilling Co.* v. *Bellows & Co.*, 102 Cal.App.2d 8 [226 P.2d 751].) That is this case.

■ Appellants also argue that they are not in competition with respondent because respondent is not engaged in the manufacture and marketing of cocktail sauce. This is a factor to be considered, but it is not controlling. The proper rule was stated as follows in *Winfield* v. *Charles,* 77 Cal.App.2d 64 [175 P.2d 69], where the court pointed out that section 3369 of the Civil Code defines unfair competitors as including "unfair or fraudulent business practice." After pointing out that, although the parties were not in competition, the plaintiff had built up a good reputation in the general field under the name "Winfield," and that defendant was attempting, in a related field, to capitalize on the reputation of plaintiff, the court stated (p. 70) :

"It is unnecessary, in such an action, to show that any person has been confused or deceived. It is the likelihood of deception which the remedy may be invoked to prevent. [Citing a case.] 'It is sufficient if injury to the plaintiff's business is threatened, or imminent to authorize the court to intervene to prevent its occurrence.' (*Sun-Maid Raisin Growers* v. *Mosesian,* 84 Cal.App. 485, 497 [258 P. 630].) Although surnames may not be appropriated as trademarks, 'long association of a name with a product results in that name taking on a new or secondary meaning, which meaning submerges the primary meaning of the word as a man's name merely, and the new meaning survives as the identification, in the market, of a product and its source.' (*J. A. Dougherty's Sons* v. *Dougherty* (1940), 36 F.Supp. 149, 151.) Both plaintiff and defendant are engaged in the manufacturing business, both have well-equipped machine shops, and it appears that both have machinery adaptable to manufacture articles other than those they at present manufacture. Appellant argues that the record shows that plaintiff and defendant do not manufacture the same articles or solicit the same trade and customers. Plaintiff's name has become a valuable asset

in connection with any equipment associated with automobiles, and the evidence shows that the bulk of defendant's business is manufacturing automobile jacks and wrenches. However, it is not always necessary to prove actual market competition where the purpose of the action is to secure injunctive relief. It was stated in *Wood* v. *Peffer*, 55 Cal.App.2d 116, at page 122 [130 P.2d 220]: 'We are aware, however, that equity may be invoked without market competition. Emphasis should be placed on the word "unfair" rather than "competition." '

"Plaintiff has established a reputation for reliability and meritorious products. If articles which are not produced by him are attributed to him or associated with his name, the injury is obvious. The court stated in the case of *Del Monte Special Food Co.* (appellee) v. *California Packing Corporation* (appellant), 34 F.2d 774, at page 775: 'The injury to the appellee by the use of the Del Monte Brand by the appellant does not result from preventing sale by appellee of oleomargarine of its own, *but from a representation to the public that it produces a product which it does not in fact produce and over which it has no control.* Its reputation for quality is therefore placed to some extent in the hands of a corporation who owes it no allegiance and has no concern in maintaining the high reputation established by the appellee, and who may utilize that reputation to sell the public an inferior production.' (Italics added.) Furthermore, in the interest of fair dealing courts of equity will protect the person first in the field doing business under a given name to the extent necessary to prevent deceit and fraud upon his business and upon the public. For this purpose the second in the field may be enjoined from using the name, even though the principal places of business are at a considerable distance from each other. (*Benioff* v. *Benioff*, 64 Cal.App. 745, 748 [222 P. 835].) 'No inflexible rule can be laid down as to what conduct will constitute unfair competition. Each case is, in a measure, a law unto itself. Unfair competition is a question of fact. . . . The universal test question is whether the public is likely to be deceived.' (63 C. J. 414; *Pohl* v. *Anderson*, 13 Cal.App.2d 241, 242 [56 P.2d 992].)' '

It is not essential to prove fraudulent intent. An injunction is proper if the natural consequences of defendant's conduct are such as to cause deception. (*Hoover Co.* v. *Groger*, 12 Cal.App.2d 417 [55 P.2d 529]; *Dodge Stationery*

*Co.* v. *Dodge,* 145 Cal. 380 [78 P. 879] ; *Wood* v. *Peffer,* 55 Cal.App.2d 116 [130 P.2d 220].)

Here it is a reasonable inference from the evidence that the name "Tarantino's" was used by appellants in a deliberate attempt to confuse and to mislead the public into believing that the product was sponsored or manufactured by respondent.  It was proper to enjoin such activities.

Appellants also object to the extent of the injunction, claiming that it has deprived them of using their family name in their business.  The injunction does not so provide. It simply prohibits the use of the name "Tarantino's" in connection with the marketing of the cocktail sauce.  In view of appellants' actions in connection with this product, this was a reasonable limitation in the activities of appellants.  The use of the family name in connection with other activities of the corporation is not enjoined.  The appellants have improperly used their family name in a trademark sense.  The injunction goes no further than was reasonably necessary to protect respondent's rights in view of appellants' past actions.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.