[Civ. No. 10919.   Third Dist.   July 2, 1965.]

MacSWEENEY ENTERPRISES, INC., Plaintiff and Appellant, v. JOSEPH P. TARANTINO et al., Defendants and Respondents.

Jennings, Haid, Gartland & Tilly, Eugene L. Gartland and John V. Tilly for Plaintiff and Appellant.

Lally & Martin and Thomas W. Martin for Defendants and Respondents.

PIERCE, P. J.—This is a suit for an injunction. Plaintiff is the senior user of a trade name and symbol. The name, also the family name of defendants, has comparatively recently (1960) been adopted by them as the name of their business. Both parties are in the restaurant business but with different specialties. The name-symbols used in advertising are, as the court found, similar. Judgment was for defendants and plaintiff appeals. The evident theory of the trial court was that although public confusion had resulted there was no fraud and therefore use by defendants of their own surname could not be enjoined. Our reversal is upon the grounds that plaintiff's widely advertised and well-known senior use of the name had given it a "secondary" meaning and that junior use of even a family name will be enjoined when public deception inevitably results. We limit the injunctive relief to be granted as hereinafter explained.

Plaintiff operates a widely advertised and well-known seafood restaurant on Fisherman's Wharf in San Francisco which since 1946 has been called "Tarantino's." The name is that of a former partner, Joseph Tarantino, whose interest had been purchased prior to the opening of the restaurant. The trial court's findings of fact included the following: "Plaintiff has spent large sums of money advertising his [*sic*] restaurant and its identifying name 'TARANTINOS' and his [*sic*] restaurant is generally referred to as TARANTINOS. . . . Plaintiff's restaurant has a national and international reputation under the name of 'TARANTINOS.' " Details in evidence supporting these findings are these: The business known as "Tarantino's" over the years has developed into an enterprise grossing about a million dollars a year. Approximately 6,000 credit cards have been issued to customers. These customers are mostly in the Bay Area but include some from different parts of the United States and from other countries. The restaurant has a mailing list of 17,000 names. Each month statements go out to not less than 4,500 persons, either billing them or soliciting patronage from former customers. "Tarantino's" has been featured in national magazines, including the New Yorker, Life, Holiday. Either articles or advertisements have appeared in National Geographic, Newsweek, Time and Fortune. Between six and seven hundred fifty thousand dollars have been spent on advertising. Seven hundred fifty thousand copies of a pamphlet called "Why Tarantino's?" explaining why a corporation solely owned by an Irishman, Eugene McAteer, is running a restaurant with an Italian name (the reason being

that many Italian names have long been identified with Fisherman's Wharf in San Francisco).

Defendant Joseph Tarantino (no relation of the former partner of McAteer) and his wife Rose are now operating a restaurant specializing in Italian food at Al Tahoe, California. Regarding this business the findings state: "From April, 1959, to June, 1960, the defendants in partnership with John Vetrano operated a restaurant under the name of 'Carlo's Pizzeria' at the same location, the name 'Carlo's' being a family name of defendants' partner Vetrano; that defendants' partnership with Vetrano was dissolved in June of 1960 and the operation of the restaurant under the name 'Carlo's Pizzeria' was discontinued . . . [and] defendants commenced the operation of the restaurant business . . . under the name 'TARANTINO's' immediately upon the dissolution of said partnership."

The findings also state: "Defendants' restaurant is an Italian food specialty house and is so identified by defendants on the restaurant menu and in advertising of said restaurant by defendants. Defendants' restaurant business is highly seasonal, the greatest volume of said business being done during the months of July, August and September of each year." A later finding adds: "Defendants have and are continuing to advertise their restaurant and are seeking business among the general public in the City and County of San Francisco and in the San Francisco Bay area."

In amplification of the foregoing defendant Joseph Tarantino testified that the percentage of "local" business was trivial; that most of his business came from the Bay Area and Sacramento, although in summer, Lake Tahoe being a great tourist attraction, the patronage was from all over the country. Nevertheless, the trial court found "Defendants' restaurant is not located in the same trading area as plaintiff's restaurant."

As stated above, all of plaintiff's advertising, the sign on its building, the menus, stationery, bar coasters and other items circulated to the public use the business symbol "Tarantino's." This is written in a particular style of free-flowing script. An example is in evidence. Defendants, after adopting the name "Tarantino's," had a sign painter design a business symbol emphasizing the word "Tarantino's." Regarding this the trial court found: "The defendants since operating under the name 'TARANTINO's' have used a type of printing in their advertising of the name 'TARANTINO's' similar to that used by plaintiff since 1945." (As in plaintiff's symbol the two "t's" are stressed, but in defendants' symbol lower case lettering "freely" rendered has been substituted for script.)

Defendants have spent approximately $25,000 for advertising. In addition to the advertising in the Bay Area noted in the findings, they advertise in El Dorado County, in the telephone book; by directories in motels (listing restaurants); the restaurant is a member of the Diner's Club organization. Defendants' business now represents an investment of approximately $198,000.

Perhaps their most prominent advertising consists of a large highway sign at Lake Tahoe showing the restaurant to be nearby, a sign in front of the restaurant building, and two highway signs, one on the Truckee River road and the other on Spooner Summit grade in Nevada, showing "Tarantino's" to be 20 and 6 miles away, respectively. Two additional signs are contemplated on U. S. Highways 40 and 50. All of the signs now in use feature the business symbol "Tarantino's" written as described. In all but one the restaurant's specialization, Italian food, is also featured.

McAteer became aware of defendants' use of the name "Tarantino's" in July or August of 1960, shortly after the defendants' adoption of the name. He requested them to avoid confusion by identifying their restaurant by use of the name "Joe Tarantino's" or by the wife's first name or both, or by use of someone else's name. Defendants refused. During the pendency of the action, defendants upon the advice of their attorney put up a sign which read:

"PLEASE DO NOT CONFUSE US WITH TARANTINO'S OF FISHERMAN'S WHARF. WE ARE PROUD OF OUR FINE ITALIAN FOOD AND HAVE NO CONNECTION WITH ANY OTHER RESTAURANT. (thank you for your patronage)

Rose A. and Joseph Tarantino"

Mr. Tarantino took this sign down later. He testified he had done so "because I noticed it was causing confusion so I took it down. *Why bring attention to anything?*" (Italics added.)

As to the extent to which the general public has been confused by defendants' use of the name "Tarantino's" or by the similarity of the trade symbol the parties as might be expected disagreed. Defendant Joseph Tarantino said: "Oh, I have had a couple of inquiries, nothing to amount to anything. It's always 'Are you related?' " In answer to the question "So there were some people of the general public who came into your restaurant that thought it was connected with 'Tarantino's?' " defendant answered "Yes. That's a common question anyone would ask an operator. Not often, but it

is asked. I'm not denying that." McAteer on the other hand testified that he personally had received about 20 complaints about a restaurant operation in Lake Tahoe using the name "Tarantino's." A witness called by plaintiff who had been a Bay Area resident familiar with Tarantino's at Fisherman's Wharf had later seen defendants' highway signs and had thought the business connected. On this issue the trial court found: "The use by the defendants of the name "TARANTINO'S" has caused confusion to patrons who are familiar with the operations of plaintiff's business."

Defendant Joseph Tarantino admitted that he knew of the existence of a 'Tarantino's" at Fisherman's Wharf but denied there had been any "ulterior" motive in adopting the name. He said: "That's my family name, and I'm proud of it, and I wanted to build up my name for my family." Plaintiff concedes that the question of any *actual* fraud in defendants' adoption of the name has been resolved against it by the court's finding: "Defendants' acts in operating the restaurant at Al Tahoe, California, under their family name, were not *calculated* to deceive the public into believing that plaintiff was the operator of said restaurant." (Italics added.)

The trial court also found: "Defendants' acts in operating the restaurant at Al Tahoe, California, under their family name, has not injured plaintiff's standing, reputation and good-will."

As conclusions of law from the facts found the court stated that defendants had a right to conduct their restaurant under the family name "TARANTINO," that their acts were proper and lawful and that plaintiff was not entitled to judgment.

Plaintiff contends on appeal that the trial court's finding that San Francisco and Lake Tahoe are not within the same trade area is unsupported by evidence. Its principal contention, however, is that the trial court misapplied the law to facts correctly found.

■ The contention that the trial court erred in finding that the two restaurants are not within the same trade area must be sustained. Both businesses advertise for, and both are getting, Bay Area trade. Defendant Joseph Tarantino conceded a large portion of their business came from there. Moreover, both Fisherman's Wharf and Lake Tahoe are prime attractions during the great summer tourist trek to California. These tourists are drawn not only from other parts of the state and nation but from all over the world. As early as 1923 in *Benioff* v. *Benioff*, 64 Cal.App. 745 [222 P. 835] it was held

that San Francisco and Los Angeles were in the same trade area of a retail fur business. As continuously increasing speed of air travel brings metropolitan areas widely separated geographically closer and closer together the trading areas, i.e., the markets of prospering businesses, may be expected to expand more and more. In *Benioff, supra,* the court mentions (on p. 746) that "Plaintiffs were considering opening a store in Los Angeles. . . ." Here, while plaintiff's "Tarantino's" has no present plan to open a restaurant at Lake Tahoe, it does have plans for expansion; it is negotiating for the purchase of a restaurant in San Diego, another near Palo Alto, and has also been approached by a chain hotel corporation to take over the dining facilities of many of its hotels. Under the circumstances described it cannot be said that plaintiff and defendants are not engaged in the restaurant business in the same trade area. It is settled law, however, that the fact two businesses are *not* in the same trade area, in the sense that they are not competing for customers in the same market, is not necessarily a determinative factor in ascertainment of the existence or nonexistence of unfair competition. (*Stork Restaurant* v. *Sahati* (1948) 166 F.2d 348.)

In California a cause of action is given by statute to the senior user of an established trade name to enjoin acts of unfair competition by a junior appropriator. (Civ. Code, § 3369, as amended in 1933. "Unfair competition" is therein defined.)[1]

Basic rules respecting actions under this section have been summarized by our Supreme Court in *Schwartz* v. *Slenderella Systems of Calif., Inc.* (1954) 43 Cal.2d 107, e.g., on page 111 [271 P.2d 857]: "The statute now provides that unfair competition may include an unfair *or* fraudulent business practice, and either ground is sufficient to permit injunctive relief. [Citations.]" And on page 112: "[I]njunctive relief against the unfair use of a trade name may be obtained in situations other than where the parties are in direct com-

---

[1] The section was amended again in 1963 after this suit was tried (Stats 1963, ch. 1606.) No change significant to the issues here was made by that amendment. As in effect when this suit was filed and tried, the section provided in part material:

"2. Any person performing or proposing to perform an act of unfair competition within this State may be enjoined in any court of competent jurisdiction.

"3. As used in this section, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, untrue or misleading advertising. . . ."

petition. [Citations.] The basis of relief in such circumstances is the possibility of injury to the reputation and goodwill of the business of the prior user from an identification of it in the minds of the public with the source of the second user's goods or services The senior appropriator may protect, by injunction, his trade name 'within the limits fixed by the likelihood of confusion of prospective purchasers.' (Rest., Torts, § 730, com. b; *MacSweeney Enterprises, Inc.* v. *Tarantino, supra,* at 106 Cal.App.2d 512-513 [235 P.2d 266]; *Winfield* v. *Charles, supra,* at 77 Cal.App.2d 70-71 [175 P.2d 68].) Although many factors may enter into a determination of whether the use of a specific trade name is likely to result in a confusion of source, the question is primarily one of fact to be determined from all of the circumstances of a particular case.''

In *Schwartz* the trial court had held that use of the word ''Slenderella'' by a junior appropriator in a noncompeting business was not likely to result in confusion of source under the facts of that case. The majority of four of the Supreme Court (per Justice Edmonds) held that it, as a reviewing court, could not hold as a matter of law that confusion *would* result. Justices Carter, Traynor and Schauer dissented. While the court was divided on the sufficiency of evidence issue, we do not believe any disagreement of the court arose, or could arise, on the principles of law discussed. In Justice Carter's dissenting opinion he said (on p. 117) : '' [I]t is now settled that actual market competition between the plaintiff and defendant either geographically or with respect to the character of the commodity or service sold, is not a necessary requisite to injunctive relief . . . because the protection afforded is to the good will and reputation of plaintiff which can be damaged by a noncompetitor defendant using the same name.''

Justice Carter's opinion also contains (on pp. 117, 118) an extensive quotation from Callmann, Unfair Competition and Trade-Marks (2d ed.) volume 3, page 1361. That text in the section cited may be summarized as follows: The author says (on p. 1361) there is *evident* confusion of businesses whenever the public is deceived into believing that good will or investment which actually belongs to a plaintiff is in some way connected with the defendant's business. The confusion described by Mr. Callmann is termed a '' 'confusion as to sponsorship.' '' He states (on pp. 1361, 1362) that the ''varying degrees and types of possible connection are, of course, myriad . . . .'' One of them referred to is that ''the

defendant's name may create the impression that it is a corporation affiliated with the business of the plaintiff'' or ''the false impression engendered by the defendant may also be that of a former connection now severed. The author also says (on p. 1363) that a plaintiff ''is entitled to demand action to insure 'that its reputation shall be of its own making alone,' . . .'' A defendant cannot escape by proof that defendant's own reputation is equal to or even better than plaintiff's. The author says (on p. 1364) : ''On the contrary, it will be judicially presumed that an article sold by unfair methods is of inferior quality.''

Applied generally, those rules are well settled and, we think, they are undisputed by defendants here. But defendants argue that special limitations exist whenever the defendant is merely using his own surname in connection with his business. In *Tomsky* v. *Clark* (1925) 73 Cal.App. 412 [238 P. 950], such a distinction was noted. In that case the court, starting with the premise that ''The right to do business under one's own name is one of the sacred rights known to the law'' (for which statement Nims on Unfair Competition and Trade-Marks (2d ed.) § 67 is cited as authority), the case holds that ''Every man has the absolute right to use his own name in his own business even though he may interfere with and injure the business of another bearing the same name; . . .'' The court makes only one exception—that the defendant must not ''resort to any artifice or do any act calculated to mislead the public as to the identity of the establishments or to produce injury to the other beyond that which results from the similarity of names [citations].'' (*Tomsky* v. *Clark, supra,* at p. 418.)

Mr. Nims, in the fourth edition of his work ''Unfair Competition and Trade-Marks,'' section 67 et seq. (''Nature of the Right in One's Own Name''), gives extensive treatment to the extent af a man's right to use his own name in his business to the detriment of a senior user of the same name. With reference to the citation of Nims in *Tomsky* noted above and whatever that widely-cited author may have said in the *second* edition, he says (on p. 192 of the *fourth* edition) : ''Every man has a right to the use of his own name. That is the first principle. To this the law of unfair competition gradually is adding another—no man may use even his own name in such manner as to injure another unfairly or fraudulently[2] in his

---

[2]Note the use of the disjunctive.

business.'' The author, on page 194, quotes Mr. Wigmore (in an article in 10 Ill. L. Rev. 182 (1916) regarding the right of a man to use his surname as a business name: '' 'It is merely the right to obtain patronage, for wares or services, by the use of the mark that identifies our personality. *Now this right can never have any superior claim over and above our general duty to obtain patronage honestly.' ''* (Italics added.) Also quoted (in § 68, p. 196, ''The Right of Every Man to Use His Own Name in Business; Its Character and Misconceptions Regarding It'') is Judge Hincks' statement in *Hat Corp. of America* v. *Davis Corp.*, 4 F. Supp. 613: '' '. . . In an age when by corporate activity, mass production and national distribution, the truly personal element has been so largely squeezed out of business, there is naturally less legitimate pecuniary value in a family name. Any other name is as valuable and as available for all legitimate purposes. Formerly, before the age of advertising, when good-will in business was slowly developed from personal contacts, the situation may have been otherwise.' ''

Mr. Nims adds: ''No discussion of this question is complete or adequate without a consideration of the rights and interests of the purchasing public. The person who has been deceived and fooled in buying goods, finds little comfort in being told that the dealer happens to be wise enough to use his own name as the instrument of his piracy. From the standpoint of the consumer there is no difference, and there should be no difference in the eyes of the law, between a personal name and any other name used as a mark on merchandise if unfair competition results from its use.''

In section 72 (''Acquired or 'Secondary' Meaning of Personal Names,'' on p. 219) Mr. Nims states that where a personal surname has become so identified with a business as to be ''practically synonymous with it, it follows if a rival uses this same name even though it is his surname, to do so *cannot but create confusion.*'' (Italics added.) A number of cases are cited which, always containing the preamble that the right of use of one's own name is sacred, stress that *actual* fraud must be shown. But it is noteworthy that actual fraud usually *is* found on the basis of evidence which shows little more than the junior's adoption of his surname in his business with full awareness that the name has long been used by another under circumstances giving the name an acquired and ''secondary'' meaning. And the author observes (on p. 225): ''In cases where a complete and definite secondary meaning

is established, the court must decide between depriving the defendant of his use of his own name, not totally, but merely in connection with the sale of some particular article or articles on which the plaintiff has used the name, and permitting a condition to continue *in which fraud is inevitable.*" (Italics added.) As we view it that statement is as applicable where service businesses, such as restaurants, are involved as where the sale of a product is involved, and the fraud—call it constructive fraud, if you will—is just as "inevitable."

Returning to California law, the First District Court of Appeal in the *Tomsky* decision, as we have seen, held that a junior appropriator could not be deprived of a right to use his own name without a showing of *actual* fraud and none was there found. (Neither had the name, as used by plaintiffs, acquired any "secondary" meaning.)[3] The *Tomsky* decision was eight years old when the Legislature in the 1933 amendment of Civil Code section 3369 included unfair or fraudulent business practice (again note the disjunctive) within the definition of "unfair competition." The section makes no distinction between cases of unfair competition which involve the use of a family surname and those which do not.

*Schwartz* v. *Slenderella Systems of California, Inc., supra,* 43 Cal.2d 107, the rules of which have been discussed above, did not involve the use of a surname. However, Justice Edmonds' majority, and Justice Carter's dissenting, opinions cite with approval *MacSweeney Enterprises, Inc.* v. *Tarantino,* 106 Cal.App.2d 504 [235 P.2d 266], which *did* involve not only a family surname, but *this* surname (same plaintiff—a different Tarantino). There the facts, so far as the extent of the use of the name "Tarantino" by plaintiff was concerned, are substantially identical with the facts here. The court refers (on p. 512) to the "secondary meaning" which such use gives to the name involved. True, the original MacSweeney case involved an actual fraud, a planned and contrived use of the name by the junior appropriator, and here the court's findings negate any "calculated" intent to defraud plaintiff. But it is also true that Justice Peters' opinion in *MacSweeney, supra,*

---

[3] As a matter of fact it there appeared that Rauer, one of the incorporators of *defendant* firm, had been the originator of the disputed name: that after Rauer's original business had failed plaintiffs had adopted the name "Rauer" to capture some of Rauer's old customers. Rauer thereafter became an officer and stockholder of defendant firm. The trial court not only denied plaintiffs an injunction, it also, on defendant's cross-complaint, enjoined *plaintiffs* from using the name "Rauer." This judgment was affirmed on appeal.

on page 511, quoting *Jackman* v. *Mau*, 78 Cal.App.2d 234 [177 P.2d 599], says: " '. . ."One must use his own name honestly and not as a means of pirating the good will and reputation of a business rival; and *where he cannot use his own name without inevitably representing his goods as those of another* he may be enjoined from using his name in connection with his business." ' " (Italics added.) Justice Peters also says (on p. 513) : "It is not essential to prove fraudulent intent. An injunction is proper if the *natural consequences* of defendant's conduct are such as to cause deception." (Italics added.) As noted above the trial court here *did* find, while negating actual fraud that "The use by the defendants of the name 'TARANTINO'S' has caused confusion to patrons who are familiar with the operations of plaintiff's business."

*Visser* v. *Macres* (1963) 214 Cal.App.2d 249 [29 Cal.Rptr. 367], which seems to be the most recent treatment by an appellate court of this state of the problem of the junior use of a family surname, had facts very much like those here, and we regard it to be indistinguishable both on facts and law. Plaintiff had bought a florist business in Anaheim known as "Macres Florist." The sellers were two members of the Macres family. The name was sold with the business. Defendant, a member of the same family, a florist in Santa Ana, announced an intention to set up a competing florist business in Anaheim. Plaintiff sought and obtained an injunction. The Fourth District Court of Appeal (per Coughlin, J.) affirmed. It was held that, although in the absence of fraud *or* unfair practice, defendant had a right to use his own name in his business such junior user must be enjoined under the facts described. It was held the name had acquired a "secondary" meaning and that the use of the name "Macres" by the junior user would be likely to deceive the public (this being, as the court said, the essential test, see p. 255 of 214 Cal.App.2d). The court states (on p. 253) : ". . . Such secondary meaning grows out of long association of the name with the business, and thereby becomes the name of the business as such; is acquired when the name and the business become synonymous in the public mind; and submerges the primary meaning of the name as a word identifying a person, in favor of its meaning as a word identifying that business." The court expressly rejected the contention that there must be actual fraud. It held (on p. 255) that the use would be enjoined "if a natural consequence of that use may be to deceive or confuse the public, even though no actual intent to defraud be present."

█ It is true that the court (on p. 253) spoke of a subsequent use which is "calculated" to deceive. If this is puzzling the confusion is only one of semantics. "Calculated" has two meanings. It is used in the sense of "planned or contrived;" but it is also used as synonymous with "likely." (See Webster's Third New International Dictionary Unabridged.) It is certain that the court in *Visser* used it as synonymous with "likely" since in the opinion, as pointed out, the words are used interchangeably. The trial court's findings here also use the word "calculated," saying that defendants' use of the name was "not calculated to deceive the public" but it is clear that *its* use of "calculated" was intended to be synonymous with "planned or contrived."[4] We say this advisedly. Since it also was found by the trial court that deception *had* occurred it must follow that the court considered it was *likely* to occur. Having effectually said deception was likely but that it was not "calculated" it is obvious the court meant defendants had not intended to deceive the public.

█ It is the rule in *Visser* that the original user of a trade name whose exploitation of that name has given to its use a "secondary" meaning is entitled to enjoin use by a junior appropriator (even though the trade name be the latter's surname) when and to the extent that deception is likely. Actual fraud, i.e., planning or contrivance, by the junior user is not necessary. We accept the *Visser* rule as an expression of sound law.

█ We also hold that proof of actual monetary damage is not necessary to the right to an injunction, the other factors entitling plaintiff to relief being present.

As stated above, the trial court found that defendants' acts had "not injured plaintiff's standing, reputation and goodwill." This finding, however, cannot be reconciled with the other facts found. It is also antagonistic to the concept that any usurpation of another's reputation is ipso facto an "injury." (See discussion *supra,* p. 556, based upon 3 Callmann, Unfair Competition and Trade-Marks, p. 1361.)

---

[4]In *Tomsky* v. *Clark, supra,* 73 Cal.App.412, it is also obvious that the court used "calculated" as meaning "planned" or "contrived" because elsewhere in the decision it spoke of "actual" fraud. The *Tomsky* case was unquestionably correctly decided. Its statement of the law in this regard, however, does not accord with the concept discarding fraud as a necessary factor. The *Tomsky* rule cannot be followed without disregarding the legislative intent in Civil Code section 3369 (see footnote 1) where "unfair or fraudulent business practice" is used in the disjunctive. We accept *Visser* v. *Macres, supra,* 214 Cal.App.2d 249, as expressing the correct rule.

Also, in 1962 this court held in *People* ex rel. *Mosk* v. *National Research Co. of Cal.*, 201 Cal.App.2d 765, on page 771 [20 Cal.Rptr. 516] : ". . . As our Supreme Court has stated: ' "It is also to be borne in mind that the rules of unfair competition are based, not alone upon the protection of a property right existing in the complainants, but also upon the right of the public to protection from fraud and deceit. . . ." ' (*Academy of Motion Picture Arts & Sciences* v. *Benson, supra,* 15 Cal.2d at p. 691 [104 P.2d 650].)"

▮ As has been shown above, if there is deception which presents a likelihood of confusion of defendants' goods or services with plaintiff's, the latter's reputation is put in jeopardy and that is enough. This is true even though it also be shown that defendants' own goods or services are themselves excellent. (See *Academy of Motion Picture Arts & Sciences* v. *Benson,* 15 Cal.2d 685, 691-692 [104 P.2d 650].) ▮ A plaintiff is not required to stand by and see his business actually injured "before he may stay the hand" of the person usurping his goodwill and reputation. "[A] person should not be compelled to abide the results of trespass for the purpose of obtaining evidence of its injurious effects. Wrongs which are the probable result of given means should be prevented, not awaited." (*Hall* v. *Holstrom,* 106 Cal.App. 563, at p. 572 [289 P. 668]. See also *Stork Restaurant* v. *Sahati, supra,* 166 F.2d at p. 359.)

▮ The discussion above has, we believe, made it clear that defendants' use of the name "Tarantino's" in the present manner of its use has come in direct collision with plaintiff's superior rights to the use of that name in the restaurant business, a use which has given the name a secondary meaning. It is also clear that although a fraud on the public was not contrived by defendants, deception is inevitable and will be so long as present practices are continued.

Plaintiff is entitled to injunctive relief. The only question remaining is: How far should the injunction go? In this regard we purposely leave its extent and limits undefined. In reversing the lower court's denial of an equity decree we do not believe we, as an appellate court, should attempt to prescribe the nature and terms of the decree to be made too closely. The trial judge, with the aid of the litigants and their counsel, is in a better position to shape the decree unshackled by direction from us. ▮ Stated in another way, that which is or is not a similarity of trade names or trade symbols likely to deceive the public is a determination which,

when applicable rules of law are adhered to, can more equitably be made by the trial court than by us.

All that plaintiff originally asked was that defendants clarify the existing confusion by the inclusion of their given names, or the name of one of them as a part of the name of their business. Despite Mr. Nims' criticism of the "explanatory phrase rule" (see Nims, *op. cit.*, § 71) the trial court may deem it can be reasonably applied here. On the other hand, it may determine that the problem of deception and confusion can only be solved by the adoption by defendants of another name entirely. (The giving of prominence to the added fact that Joseph and Rose Tarantino are the proprietors of that business should satisfy family pride of name and this, of course, could be done without deceiving the public. The above statements we make as suggestion, not as direction.)

The symbol "Tarantino's" as now rendered must be enjoined. Defendants contend that it does not confuse. Placed in close juxtaposition with plaintiff's adopted symbol and when the two are examined together the trade symbols are distinguishable, but that is not the way the public sees them. (*Don Alvarado Co.* v. *Porganan,* 203 Cal.App.2d 377, at p. 382 [21 Cal.Rptr. 495].) Defendants argue that under no circumstances would the public be confused, plaintiff disagrees. The trial court by its findings has stated the two symbols are "similar"; the three members of this court find them confusingly similar. Determination of such matters is necessarily subjective. (See *Don Alvarado Co.* v. *Porganan, supra,* p. 384.)

If defendants are to retain "Tarantino's" as a part of their trade name they must adopt a new symbol. Again, this can best be accomplished with the aid and under the supervision of the trial court.

The judgment is reversed with directions to the trial court to issue an injunction, the terms of which shall be in accordance with the views expressed in this opinion.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied July 26, 1965, and respondents' petition for a hearing by the Supreme Court was denied August 25, 1965.