LIBERTY OIL CORP. *v.* CROWLEY, MILNER & CO.

1. TRADE-MARKS AND TRADE-NAMES—EXCLUSIVE RIGHTS—PROTEC-
TION.

One who adopted a trade-mark and trade-name and used it for a number of years in a certain locality on containers for its product acquired exclusive right to use of such trade-mark and trade-name in that locality and its right to relief for infringement is based upon the principles of common business integrity.

2. SAME—SIMILARITY—CONFUSION.

Trade-mark and trade-name adopted by defendant in the sale of lubricating oil *held,* so similar to that hitherto adopted and used by plaintiff for same purpose in same locality as to confuse or mislead those using ordinary discrimination.

3. SAME—LUBRICANTS—INJUNCTION.

Corporation which had adopted and used term "Liberty oils and greases" with representation of statue of liberty on its containers of lubricants for a number of years *held,* entitled to injunction against further use of term "Liberty motor oil" by department store in same vicinity in vending lubricating oil.

4. SAME—DAMAGES—ACCOUNTING—NOTICE OF INFRINGEMENT.

Department store, which sold lubricating oil in containers bearing similar trade-mark and trade-name to that used by plaintiff corporation in same vicinity, *held,* not liable in damages or accountable for profits from such sales as had been innocently consummated prior to notice of infringement, but after notice had been given by corporation, defendant was liable for actual damages and to account for profits on sales thereafter made.

5. SAME—LOSS OF CUSTOMERS—NOTICE OF INFRINGEMENT.

In suit to enjoin infringement of trade-mark and trade-name used in sale of lubricants, evidence, *held,* insufficient to establish that plaintiff lost any of its customers as direct result of defendant's infringement after notice of infringement had been given, or that, in equity, defendant should be liable for damages for sales made on request.

6. EQUITY—LACHES.

Record *held,* not to sustain defense of laches in suit to enjoin infringement of trade-mark and trade-name.

Appeal from Wayne; Webster (Arthur), J. Submitted October 5, 1934. (Docket No. 111, Calendar No. 38,058.) Decided January 7, 1935.

Bill by Liberty Oil Corporation, a Michigan corporation, against Crowley, Milner & Company, a Michigan corporation, to enjoin the use of a trademark and trade-name and for a money decree. Decree for plaintiff. Defendant appeals. Plaintiff cross-appeals. Modified and affirmed.

*Swan, Frye & Hardesty* and *John C. L. Cowen* (*John F. Jordan,* of counsel), for plaintiff.

*Lucking, VanAuken & Sprague,* for defendant.

NELSON SHARPE, J. The plaintiff corporation was organized in 1918 by Emil Mettetal. He and his wife had all of the stock therein except one share held by his attorney, John F. Jordan. Its purpose was to engage in the sale of lubricating oils. It adopted the trade-mark "Liberty oils and greases," with a representation of the statue of liberty placed thereon. The sales, with a few exceptions, were made in the counties north of Wayne, usually spoken of as "the thumb," and on the personal solicitation of Mettetal. It did no refining. Orders were sent in to a number of different refining companies and shipments made direct to the customers in containers bearing plaintiff's trade-mark.

The defendant is one of the large department stores in the city of Detroit. Some of its departments are conducted by parties having no interest in the corporation, under leasing arrangements therefor. Automobile accessories, which included lubricating oil, were handled by the Sterne-Jay Cor-

poration of New York City. In February, 1931, a carload, consisting of 1,410 five-gallon cans of oil, bearing the brand or trade-mark "Liberty motor oil," with a representation of the statue of liberty appearing thereon, was shipped by the Radbill Oil Company of Philadelphia, on the order of the Sterne-Jay Corporation to the defendant's store at Detroit. It was advertised by defendant and sales thereof made from its store. Neither the defendant nor the Sterne-Jay Corporation had any knowledge at that time that plaintiff was engaged in the sale of Liberty oils.

Mettetal testified that some customers called his attention to sales made by the defendant at a less price than that for which his corporation was selling it, and that he went to the store and purchased a can for himself. On May 16, 1931, plaintiff's attorney wrote defendant that its action in simulating plaintiff's trade-mark on its containers afforded ground for a suit for an injunction and damages, and suggested a possible adjustment of the matter. Defendant answered that it had no intention of infringing on any trade-name and that it would at once take up the matter with the people from whom it purchased its oils. It referred the matter to the Radbill Oil Company. Correspondence relative thereto was had between the attorney for this company and plaintiff's attorney and an offer of settlement made, which was rejected.

On August 16, 1932, the plaintiff filed the bill of complaint herein, alleging that defendant had been, and was then, infringing its trade-name and trademark in the sale of oils to its great damage and loss, and prayed for an injunction to enjoin it from doing so and for a decree for the damages it had sustained thereby. Defendant's answer contained a

denial of many of the allegations in the bill and of plaintiff's right to the relief prayed for.

After the submission of proofs, the trial court found that plaintiff had a "prior right to the use of the word 'Liberty' and the 'Statue of Liberty,' in this locality, in connection with lubricating oil." He found difficulty in assessing the damages, but finally fixed them at $750, and entered a decree therefor, and in it enjoined the defendant from selling or offering for sale any lubricating oil bearing such trade-mark, as prayed for in the bill of complaint. The defendant has appealed therefrom, and the plaintiff by cross-appeal insists that the award of damages to it should be increased to $9,250.

The defendant contends:

"1. No injunction should issue.

"2. Plaintiff is not entitled to damages or profits.

"3. Plaintiff is guilty of laches."

1. There has been much litigation in this country over the right of a party to be protected in the use of a trade-mark. The subject is considered and discussed in 63 C. J., p. 300 et seq., 26 R. C. L., p. 826 et seq., and Nims on Unfair Competition and Trade-Marks (3d Ed.), and the decisions of the courts are reviewed at some length therein.

The plaintiff had adopted and used its trade-mark for a number of years on the containers in which its oil was sold. There can be no question under the proofs submitted that the resemblance between it and that used by the defendant on its containers was so marked that purchasers from defendant were deceived thereby. By priority of adoption and actual use plaintiff acquired the exclusive right to use it in connection with its sale of Liberty oil in Detroit and its vicinity, and its right to relief "is based upon the principles of common business in-

tegrity." *Good Housekeeping Shop* v. *Smitter,* 254 Mich. 592.

"The single question in this connection is whether the trade designation adopted by them is sufficiently similar to that of the plaintiff to be likely to confuse or mislead those using ordinary discrimination." *W. B. Manfg. Co.* v. *Rubenstein,* 236 Mass. 215, 219 (128 N. E. 21, 11 A. L. R. 1283).

In *Dayton* v. *Imperial Sales & Parts Co.,* 195 Mich. 397, 406, this court said:

"The generally recognized and customarily granted relief in cases of this kind, and that to which plaintiffs are reasonably entitled where the offense is established, is restraint from further use of the imitating name."

The injunction was properly granted.

2. To what damages, if any, is the plaintiff entitled? The estimate of its counsel is based upon the claim that defendant's representative admitted that it had sold 12 carloads of Liberty oil bearing the trade-mark referred to. It seems clear that any admission thus made referred to all classes of oil which was sold in defendant's place of business under its arrangement with the Sterne-Jay Corporation, and that but one carload, consisting of 1,410 five-gallon cans of Liberty oil, was received by it, of which all but three cans had been sold.

It is undisputed that, up to the time when the defendant was notified by plaintiff's attorney that it was simulating plaintiff's trade-mark on its cans of Liberty oil, it had no notice or knowledge that the plaintiff was selling oil in the containers on which its trade-mark appeared.

The plaintiff maintained no office, in the sense in which that term is generally used, in the city of Detroit. For several years it had a lock box in the

postoffice, and used a part of the basement of the house in which Mr. and Mrs. Mettetal were living for a workroom. Mettetal testified:

"When this storm struck Detroit, these hard times and everything, I went up to my cottage up north. I have a hunting cottage up there—so then I moved my office over with the Perry Printing Company, 5075 Grand River. That was about two or three years ago; and then Mr. Perry moved it over on 2614 West Warren and I went over with him, and that is where I am now—been there for the last year or so. In that office I have a desk, typewriter and printing, my booklets, samples of oil, and all my files and things like that. My name is not on the door nor is the Liberty Oil Corporation name on the door. Mr. Perry has his name there, so I did not put anything on the door, but I have it inside on my desk."

The first sale of Liberty oil was made by the defendant on February 26, 1931. The letter from plaintiff's attorney notifying it that it was infringing on plaintiff's trade-mark was received by it on May 16th of that year. It had then sold 423 cans of the oil. Up to that time it seems clear under the authorities that it had incurred no liability to the plaintiff by reason of such sales. Had plaintiff then begun suit, defendant would have been enjoined from making further sales but would not have been held accountable for the profits made by it on the oil it had then sold or for any damages plaintiff sustained by reason thereof.

In Nims on Unfair Competition and Trade-Marks (3d Ed.), § 431, it is said:

"An accounting will not be ordered where the infringing party acted innocently and in ignorance of the plaintiff's rights, provided such party stops his illegal practices after he discovers the truth."

In a leading Massachusetts case, *Regis* v. *Jaynes & Co.*, 191 Mass. 245, 248 (77 N. E. 774), that court said:

"There is some conflict in the decisions; but we think that the weight of modern authority is in favor of the rule that an account of profits will not be taken where the wrongful use of a trade-mark or a trade-name has been merely accidental or without any actual wrongful intent to defraud a plaintiff, or to deceive the public."

In *Straus* v. *Notaseme Hosiery Co.*, 240 U. S. 179 (36 Sup. Ct. 288), it was held (syllabus):

"While one using an unregistered design similar to that adopted earlier by another may be enjoined from further use thereof, he may not be charged with profits if it appear that the original imitation was unintentional, that no deceit or substitution of goods was accomplished in fact, and that no considerable part of the business was due to his goods being supposed to be those of the earlier user of the design."

After defendant received the notice from plaintiff's attorney it refrained from advertising the Liberty oil except in one issue of a paper published in the city, but it continued to sell it to those asking for it, and on August 16, 1932, when this suit was begun, it had sold the balance of the 1,410 cans except 59 cans, and 56 of these cans were afterwards sold by it.

On June 16, 1931, the defendant wrote the plaintiff's attorneys:

"If it is your request that we discontinue sale of Liberty oil, we will do so with the understanding that your clients will be held responsible for any loss of profit that may be due to your taking such

action, should it develop that your clients do not have sole rights to the name."

Plaintiff's attorneys replied thereto on July 8, 1931:

"If we were not convinced of the long-standing character of our rights in the matter of the Liberty oil trade-mark we would not have written you as we did. Whether or not you discontinue your sales under the objectionable mark must be for your counsel to decide, without assurance from or responsibility by us. We are glad to note, however, that you are in touch with the Philadelphia counsel for the source of your merchandise supply in this line, and we believe that in friendly conference with him we can convince him, without the trouble and expense of court proceedings, of our client's right both to his right to the use of the trade-mark which your merchandise has been using without justification and of his right to damages covering the period of your merchandising of the oil in question."

In the sales made by the defendant after the receipt of this letter it subjected itself to the risk of a final determination that plaintiff's claim of infringement was well founded, and as such claim was sustained by the trial court, and is now sustained by this court, it became liable to account to the plaintiff for the profits it received on such sales and for any damages plaintiff sustained thereby. Nims on Unfair Competition and Trade-Marks (3d Ed.), § 421, and cases cited therein; *Hamilton-Brown Shoe Co.* v. *Wolf Brothers & Co.*, 240 U. S. 251 (36 Sup. Ct. 269).

Defendant's illegal acts in making such sales are in no way excused by the testimony of its assistant treasurer that—

"During the period subsequent to that time, until the institution of this suit, it was my assumption

that the matter was being taken care of between the plaintiff there and the source of supply of the oil. Not having heard anything further, I naturally thought that was the case."

In the opinion filed by the trial court he said:

"It appears from the testimony that the profit Crowley, Milner & Company derived from their contract with Sterne-Jay Company did not exceed $250. This should be taken into consideration in an estimate of plaintiff's damages. In my opinion, the total damage plaintiff suffered by reason of defendant's advertising and selling the lubricating oil in question (which includes the profit referred to above) would be amply compensated by an award of $750."

Plaintiff's counsel in their brief say that to its damages should be added "the unlawful profits of defendant, amounting, as nearly as they can be determined, to $250."

While the amount of the profits as thus stated by the court and counsel was apparently not limited to the sales made after the notice of infringement was given, we are satisfied that it was not in excess of the profits realized by the defendant thereafter and that plaintiff is entitled to recover this amount.

Plaintiff's claim for damages other than the loss of the profits on the oil sold by the defendant must be founded upon proof that the customers whom it has lost by reason of the sales made by the defendant will not return to it and that the business it had established has been injured thereby. There is evidence that certain persons who had handled its oil quit doing so when informed that what they supposed to be the same oil was sold by the defendant at a price less than it sold it. But a careful examination of the record discloses that plaintiff's loss of

business in this respect occurred prior to the notice of infringement given to defendant, and, as already stated, no liability attached to the defendant therefor. When the manner in which plaintiff conducted its business and the few customers it at any time had in the city of Detroit and its vicinity are considered, it would, in our opinion, be inequitable to award it damages on account of the sales made by defendant after the notice was given, which were made only to persons on request therefor.

"Damages for infringement or unfair competition in a suit in equity must be confined to the loss actually sustained by plaintiff as the direct and natural consequence of such acts, and damages which are uncertain or speculative cannot form the basis of a recovery." 63 C. J. p. 578.

3. The record does not disclose any laches on the part of the plaintiff on which the defendant may rely as a defense.

The decree will be modified by reducing the allowance to plaintiff from $750 to $250, and as thus modified affirmed, with costs in this court to defendant.

POTTER, C. J., and NORTH, FEAD, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.