NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0590n.06

Case No. 14-1611

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 02, 2016
DEBORAH S. HUNT, Clerk

BAR'S PRODUCTS INC. )
)
Plaintiff-Appellant, )
)
v. )
)
BARS PRODUCTS INTERNATIONAL )
INC.; BAR'S PRODUCT INTERNATIONAL )
LTD.; BARS, INCORPORATED, California )
Corporation, )
)
Defendants-Appellees. )

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

BEFORE: SILER, GIBBONS, and COOK, Circuit Judges.

COOK, Circuit Judge. For over 30 years, Bar's Products (Bars) and Bars Products
International (BPI) shared the worldwide market for "Bar's Leaks" brand automotive supplies.
Bars sold in the United States and Canada; BPI sold internationally. This relationship soured in
2007 when Bars started selling products abroad under a different brand name, and BPI responded
by promoting its products at a Las Vegas trade show. Bars sued BPI, alleging trademark
infringement and unfair competition; BPI countered with breach-of-contract and unfair-
competition claims. The district court dismissed all of Bars's claims but allowed a jury to
consider BPI's counterclaims. The jury awarded BPI $1,560,195 for breach of contract and
$974,849 for unfair competition. On appeal, Bars argues that the district court erred in denying

its motion for judgment as a matter of law on both of BPI's counterclaims and by refusing to grant Bars leave to amend its trademark claim. We AFFIRM in part and REVERSE in part.

## I.

In 1947, Fred Barton developed a radiator stop-leak product and later established Bars to market it. Barton protected his invention through patents and trademarks, holding some in his individual capacity and others through Bars or Barton's wholly-owned company, Huki Lau. Over the next two decades, Barton built an international distribution chain by selling raw materials to companies licensed to produce and sell Bars's signature brand of "Bar's Leaks" products.

BPI began as one of Bars's foreign licensees. In 1973, Barton, Huki Lau, and Bars executed a series of agreements to "sell, assign and transfer" to BPI "all foreign business in any and all countries foreign to the United States except Canada including all right, title and interest in any and all . . . foreign inventions, patents, trademarks . . . together with the good will of the foreign business." Bars was a party to only one of those agreements; Barton or Huki Lau executed the rest in their own names.

Through these agreements, BPI gained control over the foreign distribution of Bar's Leaks products outside of Canada. For the next 30 years Bars and BPI maintained a harmonious business relationship. Bars sold BPI the raw ingredients to make Bar's Leaks products and neither party encroached on the other's territory. The two companies also shared a booth for many years at the Automotive Aftermarket Products Expo (AAPEX) in Las Vegas, with BPI attending as Bars's guest. At these conventions, Bars referred international buyers to BPI.

This relationship deteriorated in the early 2000s when Bars increased the price of raw materials and proposed to purchase back all of BPI's assets and goodwill. When BPI refused,

Bars demanded a two-month lead time on all orders, which, when combined with the price increase, prompted BPI to open its own plant to manufacture the ingredients necessary to produce Bar's Leaks products. Bars later purchased the rights to the "Rislone" brand and began selling automotive products internationally under that label in 2007. At trial, Bars's President admitted that some Rislone products it sold abroad were the "same thing" as what Bars sold domestically. Moreover, some of those products referenced "Bar's Leaks" or "Bar's Products" on their labels. This marked the first time Bars sold products outside the United States without BPI's blessing.

BPI attended the Las Vegas products expo with its own independent booth for the first time in 2010. Displeased, Bars filed the present lawsuit, asserting trademark infringement and unfair competition. BPI counterclaimed for breach of contract and unfair competition, maintaining that Bars breached the 1973 agreements by selling automotive products abroad.

The district court dismissed Bars's trademark claim and refused leave to amend. Following three-and-a-half years of motion practice, Bars and BPI finally tried the case before a jury. At the close of evidence, BPI moved under Federal Rule of Civil Procedure 50 for judgment as a matter of law on Bars's remaining claims, which the court granted, and Bars does not appeal. The district court denied Bars's Rule 50 motion on BPI's breach-of-contract and unfair-competition counterclaims. The jury then returned a verdict for BPI on both counterclaims and awarded it $1,560,195 in breach-of-contract damages and $974,849 as damages for unfair competition. After the verdict, Bars renewed its motion for judgment as a matter of law, or in the alternative for a new trial or remittitur, which the district court denied. Bars appeals, taking issue with the district court's denial of its Rule 50 motions and the court's refusal to grant it leave to amend its trademark claim.

**II.**

*A. Breach of Contract*

Bars first argues that the district court should have granted its renewed motion for judgment as a matter of law on BPI's breach-of-contract counterclaim. We review this decision de novo. *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). Judgment as a matter of law is appropriate only when, construing the evidence in the light most favorable to the non-moving party, "there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999)). Michigan law governs the substance of BPI's breach-of-contract claim. *See Wells v. 10-X Mfg. Co.*, 609 F.2d 248, 253 (6th Cir. 1979).

The district court denied Bars's renewed motion because it concluded that sufficient evidence supported: (1) the existence of an enforceable contract; and (2) that Bars breached that contract. We agree.

*1. Scope of the 1973 Agreements*

Bars argues that the district court erred by allowing the jury to consider all the 1973 transferring assignments as part of the "contract" that obligated Bars, even though Barton and Huki Lau, not Bars, signed many of those assignments. At trial and on appeal, Bars maintains it should be bound only by the single agreement it signed.

The parol evidence rule forbids the introduction of evidence of prior or contemporaneous agreements to vary the terms of a written instrument that purports to be the "final expression of [the parties'] agreement." Mich. Comp. Laws § 440.2202; *United Precision Prods. Co. v. Avco Corp.*, 540 F. App'x 489, 493 (6th Cir. 2013) (applying Michigan law). But absent a finding that

the parties intended the document to represent the complete and final embodiment of their agreement, courts admit extrinsic evidence to explain the parties' intent. *See NAG Enters., Inc. v. All State Indus., Inc.*, 285 N.W.2d 770, 771 (Mich. 1979) (per curiam). And "[e]xtrinsic evidence of prior or contemporaneous agreements or negotiations is admissible as it bears on this threshold question of whether the written instrument is [the complete agreement between the parties]." *Id.*

Nothing in the single agreement Bars signed identifies the writing as the "final expression" of the parties' agreement. All the extrinsic evidence points in the other direction. Barton founded Bars and served as its president and majority shareholder for over 20 years until just before he made the assignments at issue. Barton also owned Huki Lau, which shared an address with Bars in 1973. And during the period leading up to the 1973 agreements, Bars, Barton, and Huki Lau operated as a single entity: Bars sold product through license agreements that Barton held in his individual capacity, using intellectual property that Barton or Huki Lau owned. A 1973 letter from Bars's counsel to BPI—written after Barton sold his shares in Bars— acknowledges this reality. The letter references "proper Assignments from Frederic D. Barton, Huki Lau Inc. and [Bars] to [BPI]," and confirms that "[t]hese assignments are perfect and everything now appears to be in order for commencing transfer of all rights to [BPI]."

Despite all this, Bars claims that "BPI failed to submit any evidence that Barton had the authority to enter into agreements on behalf of Bars." Yet, as the district court noted, none of the signatories testified at trial, meaning that BPI needed to rely on circumstantial evidence to show that Bars intended to be bound by the Barton and Huki Lau assignments. That evidence strongly suggests that the 1973 agreements were a package deal.

*2. Breach*

Bars argues that even considering all the agreements as a single contract, BPI produced no evidence of breach. At trial, BPI argued that Bars breached the contract by: (1) applying for foreign trademark registrations in countries where BPI owned the relevant trademarks; (2) selling products with the "Bar's Leaks" trademark outside the U.S. and Canada; and (3) selling products under the "Rislone" brand to customers outside the U.S. and Canada.

The jury awarded BPI $1,537,659 in damages for "sales of items other than Bar's Leaks outside the United States and Canada." This could only mean Rislone and the raw materials used to make Rislone, because those are the only products "other than Bar's Leaks" that Bars sells. Yet Bars reasons that because it did not own Rislone in 1973, selling Rislone could only constitute breach if the 1973 agreements include a non-compete provision or non-solicitation covenant. Bars insists that BPI failed to establish either.

BPI disclaims ever arguing that the 1973 agreements contain a non-compete provision or implied non-solicitation covenant. BPI maintains that it purchased "the exclusive rights to sell the Bars' product line in all countries (outside of the U.S. and Canada)," and Bars breached by selling automotive products abroad, whether labeled as "Bar's Leaks" or "Rislone," and regardless of whether those products existed in 1973.

The district court instructed the jury that it could construe the contract as including either an agreement that limits competition or an implied non-solicitation covenant. The general verdict form, however, asked only whether "Bars breached an enforceable contract."

"When one of several claims submitted to the jury should not have been submitted, 'a general verdict . . . cannot stand.'" *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 344 (6th Cir. 1984) (quoting *Morrissey v. Nat'l Maritime Union of Am.*, 544 F.2d 19, 26 (2d Cir. 1976)).

Otherwise "[t]here is no way to know that the invalid claim . . . was not the sole basis for the verdict." *Id.* (quoting *United Pilots Ass'n v. Halecki*, 358 U.S. 613, 619 (1959)). Accordingly, Bars is correct that if the district court erred in submitting to the jury either a non-competition or non-solicitation theory of liability, a new trial is warranted. *See, e.g.*, *Loesel v. City of Frankenmuth*, 692 F.3d 452, 467–68 (6th Cir. 2012) (ordering a new trial where the jury instructions presented alternative theories of liability, one of which was not properly submitted, and the jury returned a general verdict in favor of plaintiff); *Virtual Maint., Inc. v. Prime Comput., Inc.*, 11 F.3d 660, 667 (6th Cir. 1993) (same). We consider each theory in turn and conclude that the district court committed no error.

### a. Non-Competition Theory

Bars argues that in the absence of a non-compete provision in the 1973 agreements, BPI could have no tenable claim. According to Bars, non-compete agreements must be "expressly reserved in a contract," and because the 1973 assignments did not do so, the district court ought to have ruled in favor of Bars on BPI's non-competition theory of breach.

Before addressing the merits, BPI suggests that Bars waived this argument by failing to object to the jury instructions. But because Bars argued that the agreements lack a non-compete agreement in multiple motions before the district court—including in its motion for judgment as a matter of law before the court gave the pertinent instructions—Bars preserved this argument for appeal. *See K&T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 174–75 (6th Cir. 1996).

By framing our interpretative task narrowly—does the contract include an express non-competition provision—Bars invites the answer: clearly not. That, says BPI, is not the right question: The jury was not asked to find an express non-competition provision in the contract. The district court instructed the jury that it could find the parties to have "entered into an

agreement that limit[s] competition." The question then becomes: could the jury have construed the contract in a way that "limits competition."

Contract interpretation is generally a question of law but becomes a question of fact if the contract language is ambiguous. *Klapp v. United Ins. Grp. Agency*, 663 N.W.2d 447, 453–54 (Mich. 2003) (citing *Hewett Grocery Co. v. Biddle Purchasing Co.*, 286 N.W. 221 (Mich. 1939)). The initial ambiguity determination is a question of law that we review de novo. *Id.* at 451 (citing *Farm Bureau Mut. Ins. Co. v. Nikkel*, 596 N.W.2d 915 (Mich. 1999)). A contract is ambiguous "if the language is susceptible to two or more reasonable interpretations." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (quoting *D'Avanzo v. Wise & Marsac, P.C.*, 565 N.W.2d 915, 918 (Mich. Ct. App. 1997)). Only if the trial court finds textual ambiguity should it allow the fact-finder to consider extrinsic evidence such as the "the parties' conduct, the statements of its representatives, and past practice." *Klapp*, 663 N.W.2d at 454 (quoting *Penzien v. Dielectric Prods. Eng'g Co.*, 132 N.W.2d 130, 132 (Mich. 1965)).

At the outset, Bars faults the district court for allowing course-of-conduct evidence before finding the agreements ambiguous. The district court did err in this regard: the court instructed the jury that it could "consider the conduct of the parties" *only if* it "find[s] the contract is ambiguous." Although the court's instruction correctly states the trigger for allowing extrinsic evidence, it gets the actor wrong: the judge, not the jury, should make a finding of ambiguity. *See, e.g.*, *Klapp*, 663 N.W.2d at 451, 454. Nonetheless, "we will not set aside a jury verdict on the basis of a technically faulty jury instruction when the error is harmless." *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009) (citing *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000)).

The 1973 agreements are "susceptible to two or more reasonable interpretations," and therefore ambiguous. *City of Wyandotte*, 262 F.3d at 585 (quoting *D'Avanzo*, 565 N.W.2d at 918). The 1973 agreements all include similar language transferring to BPI "all foreign business in any and all countries foreign to the United States except Canada, including all right . . . in any and all such [intellectual property] . . . including but not being limited to" specified foreign trademarks, as "fully and entirely as the same would have been held by [Bars] had this assignment and sale not been made." The agreements describe the business sold as "radiator and cooling system products."

This language could reasonably be read to transfer not only the foreign rights in Bars's automotive and radiator cooling products circa 1973, but also the right to market Bars's future product line of radiator and cooling products. The words "including but not being limited to" and "any and all foreign countries" clearly contemplate the transfer of intellectual property other than what is described in the contract, making the transfer of associated future business a reasonable contract interpretation.

Bars resists a finding of ambiguity by focusing on the way the contracts describe the "foreign business" BPI sought to buy. All the 1973 agreements explain that Bars "*is* doing business pertaining to radiator and cooling system products" and specify that BPI "is desirous of acquiring *such* business in all countries foreign to the United States except Canada." According to Bars, the use of the present-tense verb "is" makes clear that the parties intended to transfer only Bars's foreign business and intellectual property as of 1973.

Bars's argument has force, but the use of the present-tense verb does not bear the controlling weight that Bars assigns to it. "[L]egal drafters frequently use the present tense to cover the present and the future." *Multimatic, Inc. v. Faurecia Int. Sys. USA, Inc.*, 358 F. App'x

643, 647 (6th Cir. 2009); *see also In re Stratford of Tex., Inc.*, 635 F.2d 365, 369 (5th Cir. 1981) ("[T]he present tense of a verb may sometimes refer to the past and to the future as well as to the present . . . [,] [f]urthermore, the present tense may be used when the time is actually indefinite." (internal citation omitted)). And here, the use of the present-tense does little to resolve the ambiguity present in the contract as a whole. First, that Bars would describe the nature of its business in the present tense is unremarkable. Second, while one of the 1973 agreements transfers "such foreign business," clearly referencing the preamble, the others transfer "all foreign business," without referring to the business that Bars "is doing." Third, the contracts transfer "*all* foreign business in *any and all* countries foreign to the United States . . . *including but not being limited to*" the business associated with Bars's existing intellectual property. Had the parties intended to transfer only the business associated with Bars's intellectual property circa 1973, the language "any and all" and "including but not being limited to" would be redundant.

Because we find the 1973 agreements ambiguous, only harmless error resulted from letting the jury determine ambiguity. And given this ambiguity, the jury could properly consider extrinsic evidence to discern the parties' intent. At trial, BPI found support for its reading of the 1973 agreements in the parties' course of conduct. First, Bars sent BPI a letter shortly after all the agreements were executed stating that "[t]hese assignments are perfect and everything now appears to be in order for commencing transfer of *all rights* to [BPI]." Second, Bars sold no products outside the United States, Canada, or Mexico for over thirty years between 1973 and 2007, and instead treated BPI as its exclusive international partner even as BPI's presence expanded beyond the markets that Bars serviced in 1973. Third, when Bars wanted to sell products in Mexico in 1998, it sought and obtained a license from BPI in exchange for the

payment of licensing fees. From this conduct a reasonable juror could find that Bars granted BPI the exclusive right to sell its current and future products abroad.

### b. Implied Non-Solicitation Theory

Bars next argues that no reasonable juror could have found a breach of the implied non-solicitation covenant. "[U]nder Michigan law, the sale of a business along with its accompanying good will gives rise to a covenant precluding the seller from soliciting back to himself that which he has sold." *Worgess Agency, Inc. v. Lane*, 239 N.W.2d 417, 421 (Mich. Ct. App. 1976). Bars maintains that Michigan law requires proving solicitation of a "former customer," and asserts that its only international customers in 1973 were the eight foreign distributors to whom it sold raw materials. Because the jury heard no evidence that it solicited one of those customers, Bars concludes that it could not have breached the implied covenant.

Bars's argument is flawed in several respects. To begin, Bars cites no case that would require the district court (or this court) to find that Bars's only customers as of 1973 were its foreign distributors. That Bars only sold through distributors does not mean that end-users are not its customers as a matter of law. Many companies make products intended for mass consumption but choose to sell through distributors. The implied covenant would be toothless if such a company could sell its entire business and goodwill, and then turn around and set up an identical business so long as it reaches consumers through a different distribution chain. *See Getter v. Levine*, 24 N.W.2d 149, 152 (Mich. 1946) (noting seller of a business and its goodwill may not start a new business and "represent the new business as a continuation of the old"); *Colton v. Duvall*, 237 N.W. 48, 50 (Mich. 1931) (explaining that seller is "not at liberty to destroy what he transferred or depreciate what he sold").

Bars's argument that BPI was required to show solicitation of one of the 1973 distributors also assumes that the 1973 agreements transferred only Bars's then-existing foreign business. As discussed above, however, the jury could construe the contract to transfer to BPI *all* foreign business in radiator and cooling products, not just the business Bars was doing in 1973. And because the core of a *Worgess* claim is "soliciting back . . . that which [is] sold," *Worgess*, 239 N.W.2d at 421, this distinction matters. As the jury heard, Bars sold automotive products abroad under the Rislone brand, many of which were similar to or the same as products that BPI sold as "Bar's Leaks." The jury also heard evidence that, in some cases, Bars simply placed a Rislone sticker over "Bar's Leaks" products and displayed them at international trade shows. Moreover, some of the Rislone products sold abroad referenced "Bar's Leaks" or "Bar's Products" on their labels. A reasonable juror could conclude that Bars "solicited back" the foreign business that it sold by selling substantially the same products under the Rislone brand name.

### c. Alleged Scope and Duration Errors

Bars presents two final arguments—both flawed—for why the district court erred in denying its motion for judgment as a matter of law on BPI's breach-of-contract counterclaim. Bars argues that even if the district court properly submitted the non-compete theory to the jury, the court "erred by failing to impose a reasonable scope and duration on the alleged" agreements. And to the extent the jury found breach of a non-solicitation covenant, Bars maintains that any covenant lasting decades is not supported by *Worgess*.

Bars's first argument—that a perpetual worldwide non-compete is unreasonable—seems at first, well, reasonable. No one disputes that "[n]ever is a long time." *Wolverine Sign Works v. Powers*, 227 N.W. 669, 670 (Mich. 1929). But Bars relies heavily on cases analyzing the

reasonableness of *express* non-compete clauses in employment or business-sale contracts. In such cases, the duration and geographic scope are specified, and the court analyzes the express terms to determine whether they are reasonable in light of any legitimate business interests. *See, e.g.*, *St. Clair Med., P.C. v. Borgiel*, 715 N.W.2d 914, 918–19 (Mich. Ct. App. 2006). BPI's argument to the jury, however, was *not* that the 1973 agreements include an express non-compete clause, but rather that Bars sold BPI the exclusive right to sell Bars's radiator and cooling products abroad. Cases involving express non-compete clauses therefore provide little instruction.

Even if we entertain Bars's argument and analyze the 1973 agreements as we would an express non-compete, we would still not fault the district court for denying judgment as a matter of law. "Agreements not to compete are permissible under Michigan law as long as they are reasonable." *Thermatool Corp. v. Borzym*, 575 N.W.2d 334, 336 (Mich. Ct. App. 1998). Though such inquiry is "inherently fact-specific . . . [t]he reasonableness of a noncompete provision is a question of law where relevant facts are undisputed." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 547 (6th Cir. 2007) (internal citations and quotation marks omitted) (alteration in original). In the business-sale context, "the restraint may be as broad as the business covered by the agreement and of sufficient scope to prevent competition therewith." *Owens v. Hatler*, 129 N.W.2d 404, 406 (Mich. 1964); *see also Woodward v. Cadillac Overall Supply Co.*, 240 N.W.2d 710, 714 (Mich. 1976) (noting that the reasonableness of non-competition agreements in the employer-employee context is "generally scrutinized more rigorously than the reasonableness of the covenant not to compete incident to the sale of a business").

Because the parties disputed almost every material fact regarding what the 1973 agreements conveyed, the district court properly allowed the jury to decide the reasonableness of the contract's competition-limiting effect. *See Certified Restoration*, 511 F.3d at 547. Bars sold BPI "all foreign business in any and all countries foreign to the United States." Given that a restraint in the business-sale context may be "as broad as the business covered by the agreement and of sufficient scope to prevent competition therewith," Bars has not convinced us that a restraint extending to all foreign countries is unreasonable in these particular circumstances. *Owens*, 129 N.W.2d at 406; *see also New World Sys. Corp. v. Jones*, No. 06-11603, 2009 WL 996954, at *11 (E.D. Mich. Apr. 14, 2009) (a non-competition agreement without any geographic limitations "can be reasonable if the employer actually has legitimate business interests throughout the world"); *ACS Consultant Co. v. Williams*, No. 06-11301, 2006 WL 897559, at *7 (E.D. Mich. Apr. 6, 2006) (upholding agreement prohibiting competition in all 50 states because plaintiff serviced all 50 states); *Capaldi v. LiftAid Transp., L.L.C.*, No. 267981, 2006 WL 3019799, at *4 (Mich. Ct. App. Oct. 24, 2006) (per curiam) ("A restriction that is not limited in its geographic scope is not necessarily unreasonable.").

Bars's objection to the lack of a time limitation on the implied non-solicitation covenant is equally unconvincing. Bars latches onto language in *Worgess* stating that the covenant only lasts "for a sufficient length of time in order to allow [the buyer] to attract to itself and make its own that which [the seller] sold." *Worgess*, 239 N.W.2d at 422. Bars accuses the district court of "punt[ing]" on the time-limit issue because it allowed the jury to "basically pick whatever time limit it found reasonable." But *Worgess* makes clear that the covenant "exists for no set length of time," and "is a question of *fact* to be determined by the trier of fact." *Id.* at 422 (emphasis added). The Michigan Court of Appeals emphasized this point repeatedly. *Id.*

- 14 -

Of course, just because an issue is a question of fact does not mean the district court must accept anything the jury finds. Were we the factfinder, we might agree with Bars that an implied covenant expired before Bars began selling Rislone. But respect for *Worgess* and respect for the jury's role prevents us from entering judgment as a matter of law unless "no reasonable juror" could have found the implied covenant to still be in effect. *Kiphart*, 251 F.3d at 581 (quoting *Moore*, 171 F.3d at 1078). That is a high bar and one that Bars fails to clear.

Viewing the evidence in the light most favorable to BPI, both the non-compete and non-solicitation theories submitted to the jury enjoy legal and evidentiary support. We accordingly affirm the district court's judgment with respect to BPI's breach-of-contract counterclaim.

## B. Unfair Competition

Bars next argues that it is entitled to judgment as a matter of law on BPI's unfair-competition counterclaim because the claim relies on the same conduct underlying BPI's breach-of-contract counterclaim. In the alternative, Bars asserts that BPI failed to prove damages causally connected to any unfair conduct, thereby warranting reversal, remittitur, or a new trial on damages.

Michigan law prohibits "any conduct that is fraudulent or deceptive and tends to mislead the public." *ATCO Indus., Inc. v. Sentek Corp.*, Nos. 232055, 235398, 2003 WL 21582962, at *3 (Mich. Ct. App. July 10, 2003) (per curiam) (citing *Clairol, Inc. v Boston Discount Ctr. of Berkley, Inc.*, 608 F.2d 1114, 1120 (6th Cir. 1979)). As a tort, unfair competition requires breach of a "duty separate and distinct from breach of contract." *Haas v. Montgomery Ward & Co.*, 812 F.2d 1015, 1016 (6th Cir. 1987). A plaintiff that establishes unfair competition can recover only for the "loss actually sustained by plaintiff as the direct and natural consequence of [defendant's unfair] acts." *Liberty Oil Corp. v. Crowley, Milner & Co.*, 258 N.W. 241, 244

(Mich. 1935). "[D]amages which are uncertain or speculative cannot form the basis of recovery." *Id.*; *see also Socony-Vacuum Oil Co. v. Rosen*, 108 F.2d 632, 636 (6th Cir. 1940) (applying *Liberty Oil*); *Veteran Med. Prods., Inc. v. Bionix Dev. Corp.*, No. 1:05-cv-655, 2009 WL 891724, at \*10–14 (W.D. Mich. Mar. 31, 2009) (applying *Liberty Oil* and reversing verdict where defendant presented "no evidence from which a reasonable jury could begin to determine any amount of actual damages with reasonable certainty").

The jury awarded BPI $974,849 in damages for unfair competition. In opposing Bars's renewed motion for judgment as a matter of law, BPI cited three acts that arguably show breach of a duty "separate and distinct" from breach of contract. The district court relied on these acts in denying Bars's motion. First, the court credited testimony suggesting that Bars registered trademarks in foreign countries where BPI owned the relevant marks. Second, the court cited evidence that Bars attempted to sell raw materials to Sonax—one of BPI's European licensees— for use in "Bar's Leaks" products, and "conspired with others to sell products [in] countries where BPI held the trademarks of the products." Third, the court concluded that Bars "may have attempted to deceive the public or those purchasing the products that [it] had the authority to sell such products outside the United States and Canada."

Assuming, without deciding, that these acts constitute unfair competition under Michigan law, BPI failed to prove damages causally connected to that conduct. The district court properly instructed the jury that BPI must prove damages "sustained . . . as a result of Bar's unfair competition." At trial, however, BPI failed to distinguish between breach-of-contract and unfair-competition damages at all. In fact, BPI did not even attempt to calculate its losses from the conduct that it claims was unfair. BPI's damages model calculated lost profits due to Bars's international sales of Bar's Leaks, Rislone, and raw materials, but BPI's position at trial and on

appeal is that these sales constitute breach of contract. Indeed, BPI's damages expert testified that his model assumed that Bars's sale of Bar's Leaks, Rislone, and raw materials outside the United States or Canada would "violate[] the contract" between BPI and Bars. At oral argument BPI's counsel conceded that its expert made no attempt to distinguish between breach-of-contract and unfair-competition damages.

Because BPI shouldered the burden of proving damages causally connected to its unfair-competition claim, its failure to do so is fatal. *See Liberty Oil Corp.*, 258 N.W. at 244. BPI's response, both in its brief and at oral argument, is to point out that the unfair-competition damages are less than BPI's *total* request for damages on *both* its breach-of-contract and unfair-competition claims. True enough. But that does not excuse BPI's failure to prove with reasonable certainty damages causally connected to Bars's unfair conduct. *See Liberty Oil Corp.*, 258 N.W. at 244. The damages award is thus "beyond the maximum damages that the jury reasonably could find to be compensatory" for any harm suffered by BPI as a result of Bars's unfair competition. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004) (quoting *Gregory v. Shelby Cty.*, 220 F.3d 433, 443 (6th Cir. 2000)); *see also Liberty Oil Corp.*, 258 N.W. at 244. We therefore reverse the district court's denial of Bars's renewed motion for judgment as a matter of law on BPI's unfair-competition counterclaim.

### C. Bar's Lanham Act Claim

The last appealed issue is whether the district court erred in dismissing Bars's trademark-infringement claim and denying its motion to amend. Because the district court denied leave to amend on futility grounds, we review that denial de novo. *See Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 853 (6th Cir. 2006). Amendment is proper if Bars's allegations, taken as true and

construed in the light most favorable to Bars, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To state a claim for trademark infringement under the Lanham Act, Bars needed to plead sufficient facts to establish that: (1) it owns a registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion. 15 U.S.C. § 1114(1); *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009). Bars's proposed amended complaint alleged that BPI displayed the "Bar's Leaks" trademark at the AAPEX show in Las Vegas. BPI agreed that Bars had shown the first and third factors, but disputed that its use of the mark at the show constituted "use in commerce" in the absence of proof of sales to U.S. or Canadian customers.

The district court denied Bars's motion to amend. It allowed that BPI's display of the Bar's Leaks mark at AAPEX "may . . . establish[] that [BPI] used the mark in commerce." But given Bars's admission that BPI attended AAPEX as Bars's guest for many years, the court determined that BPI "had the authority to use the mark" at AAPEX. With this authority, the court concluded, BPI's use of a separate booth *alone* could not constitute infringement. And because Bars did not allege any additional acts of infringement, such as the "use of the mark in any products sold within the United States and Canada," the court deemed amendment futile.

Before addressing the merits, we must undertake the threshold question of how to construe the district court's conclusion that BPI "had the authority to use the mark." The court cited *Allard Enterprises., Inc. v. Advanced Programming Resources*, *Inc.*, 249 F.3d 564 (6th Cir. 2001), which stands for the principle that trademark rights obtained through registration are subject to rights acquired by prior use. *Id.* at 572. But the prior-use doctrine has no bearing on

Bars's trademark-infringement claim. Bars was both the first actual user of the "Bar's Leaks" trademark and the first party to register the mark.

The court's rationale is more properly grounded in the doctrine of "acquiescence." An affirmative defense to trademark infringement, acquiescence requires "a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991) (quoting *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir. 1984)). Acquiescence requires unreasonable delay in enforcing trademark rights, prejudice to the defendant, and a showing, by words or conduct, that the trademark holder "active[ly] consent[ed]" to use of the mark. *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Tex.*, 357 F.3d 441, 452 (4th Cir. 2004) (quoting *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996)). BPI asserted this defense in its answer and advances an acquiescence argument on appeal.

Courts should not dismiss based on an affirmative defense unless "the undisputed facts conclusively establish an affirmative defense as a matter of law," *Hensley Mfg.*, 579 F.3d at 613, for example when "the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief." *Marsh v. Genentech, Inc.*, 693 F.3d 546, 555 (6th Cir. 2012) (quoting 5B Charles Alan Wright, Arthur Miller, Mary Kay Kane & Richard Marcus, Federal Practice & Procedure § 1357 at 713 (3d ed. 2004)). Because acquiescence is a fact-bound defense that requires "a qualitative examination of the parties' words and conduct and an equitable evaluation of the length of the delay and the degree of prejudice to the defendant," it is generally not susceptible to resolution at the pleading stage. *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 941 (7th Cir. 2016).

Here, the allegations in Bars's proposed amended complaint do not "conclusively establish" the defense of acquiescence "as a matter of law." *Hensley Mfg.*, 579 F.3d at 613. Though Bars did allow BPI to be a "guest[]" at its AAPEX booth for "many years" before BPI attended separately, the complaint also alleged, in no uncertain terms, that BPI is "not authorized to use Plaintiff's BARS Marks in any manner." The complaint further describes how Bars sent BPI a letter prior to the AAPEX show informing BPI that "infringement" would result from "[BPI's] use of the BARS Marks" at the show. At the motion to dismiss stage, the district court must accept all well-pleaded factual allegations as true. *Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007) (citing *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994)).

Of course, the district court might have disregarded Bars's statement disclaiming BPI's authority as conclusory or belied by other allegations in the complaint. But even if we disregard that single averment, the complaint as a whole still fails to unambiguously establish acquiescence. For one thing, the complaint says nothing about whether BPI actually *used* the "Bar's Leaks" trademark when BPI was a guest at Bars's booth. The complaint states that Bars was the "exhibitor" and that BPI was a "guest[] at the *Plaintiff's booth*," but is silent on whether BPI actually displayed or otherwise used the marks. At most, the complaint establishes that Bars allowed BPI to be physically present in Bars's booth, where Bars displayed its own marks. For another, even if Bars had affirmatively consented to BPI displaying the "Bar's Leaks" mark, Bars consented to such use in its *own booth*. It is certainly possible that to the extent inviting BPI can be construed as consent at all, it was contingent on BPI displaying its product side-by-side with Bars. *See Just Add Water, Inc. v. Everything But Water, Inc.*, No. Civ. 3:04-CV-2085-H, 2005 WL 1206874, at *3 (N.D. Tex. May 18, 2005) (denying motion to dismiss on acquiescence grounds where plaintiff had previously agreed not to sue defendant for use outside

of Texas, because it was "possible that [p]laintiff's acquiescence was contingent upon [d]efendant not using [the] mark in Texas," which defendant had allegedly done). Finally, Bars informed BPI prior to the show that it could not use the "Bar's Leaks" mark. This suggests the question whether Bars revoked any prior consent, and if so, whether that revocation defeats BPI's acquiescence defense.

In sum, the complaint allegations do not conclusively establish that Bars acquiesced to BPI's use of the Bar's Leaks trademark at AAPEX. It may be that BPI ultimately succeeds in establishing acquiescence, but such a conclusion is not dictated by the complaint. Accordingly, we reverse the district court's denial of Bars's motion for leave to amend.

One final point warrants brief discussion. Bars argues that the district court refused leave to amend on the alternative grounds that mere promotional use of a trademark, absent proof of infringing sales, is not trademark infringement. But the district court did no such thing. The district court simply held that because Bars consented to BPI's display of the mark at AAPEX, Bars would have to allege some *other* infringing conduct to state a claim. Because the district court erred in finding consent at the pleading stage, it had no occasion to address whether proof of infringing sales is necessary to state a trademark claim. We too express no view on that issue.

**III.**

For these reasons we AFFIRM the district court's judgment in favor of BPI that denied Bars's post-verdict renewed motion on the breach-of-contract claim.

We agree that BPI could show no separate damages to support its unfair-competition claim and thus REVERSE the district court's judgment that denied Bars's post-verdict renewed motion on that claim.

We REVERSE the district court's denial of Bars's motion for leave to file an amended trademark claim and remand for further proceedings.

JULIA SMITH GIBBONS, Circuit Judge, concurring.  I concur in the majority opinion but would say a bit more in connection with the remand of Bar's infringement claim.  The majority notes that the district court had no occasion to address whether proof of infringing sales is necessary to state a trademark claim.  But the district court may well have to address on remand whether the conduct here can constitute infringement.  Although our court has no authority on point, the great weight of authority is that "mere advertising…standing alone, [does] not constitute 'use' of the mark within the meaning of the Lahnam Act."  *Buti v. Perosa*, S.R.L., 139 F.3d 98, 103 (2d. Cir. 1998); *see also Couture v. Playdom, Inc.*, 778 F.3d 1379, 1381 (Fed. Cir. 2015); *Int'l Bancorp, LLC v. Societe des Baines de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 361–66 (4th Cir. 2003); *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 759–63 (8th Cir. 2010); *Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 672 F. Supp. 2d 106, 110 (D.D.C. 2009).  And it is uncertain whether noninfringing sales abroad can constitute use of the mark in commerce.  Neither party has briefed the issue, and under these circumstances, we elect not to consider it initially on appeal.  Whether this issue is resolved at the pleading or proof stage of the litigation in the trial court, we leave it for another day.

SILER, Circuit Judge, concurring in part and dissenting in part. The issues raised on appeal are narrow. For that reason, I concur with the majority opinion in Sections II.A. and II.C., but I respectfully dissent as to Section II.B. Bar's Products, Inc. ("Bars") does not challenge as inadmissible the testimony of Bars Products International's ("BPI") damages expert. Bars also does not assert on appeal—or preserve through its renewed motion for judgment as a matter of law—any prejudicial deficiency in the jury instructions on unfair competition.[1] Instead, Bars cabins its appeal to whether the evidence overlaps between BPI's counterclaims of breach of contract and unfair competition. I would affirm the denial of judgment as a matter of law because the trial record contained evidence differentiating those two counterclaims. Under our standard of review, the majority goes too far to suggest that reasonable minds could not separate the evidence presented at trial.

Reversing a district court's denial of a renewed motion for judgment as a matter of law requires a showing that "viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012) (citation omitted). "[W]e may not weigh the evidence, question the credibility of witnesses, or substitute our own judgment for that of the jury." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 306 (6th Cir. 2016) (citation omitted).

---

[1] Bars admitted at oral argument that it did not object to the jury instructions, suggesting that its motion practice preserved its legal theories. Our law is clear that Bars's conduct amounts to waiver. *See, e.g., Clarksville-Montgomery Cnty. School Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1006 (6th Cir. 1991) ("We first note that Clarksville's failure to object to a specific charge before and after the jury charge is given constitutes waiver of the objection." (citation omitted)); Fed. R. Civ. P. 51(c)(1) ("A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection.").

The majority is correct that a plaintiff suffering damages from unfair competition can recover only for the "loss actually sustained by plaintiff as the direct and natural consequence of [defendant's unfair] acts." *Liberty Oil Corp. v. Crowley, Milner & Co.*, 258 N.W. 241, 244 (Mich. 1935)<u>. But this court has also cited *Liberty Oil* for the proposition that only "some evidence" of "measured damages or loss of profits" is required.</u> *Socony-Vacuum Oil Co. v. Rosen*, 108 F.2d 632, 636–37 (6th Cir. 1940) (applying *Liberty Oil*). Although *Socony-Vacuum* declined to address what measure of evidence is sufficient to ascertain an exact damages amount, it nonetheless affirmed the judgment in the trial court because record evidence was present. *Id.*; *see also Skimin v. Fuelgas Co.*, 66 N.W.2d 666, 669 (Mich. 1954) ("The fact that damages cannot be measured easily or with mathematical certainty or absolute accuracy is no ground for denying them." (citation omitted)).

The trial record demonstrates that the jury heard evidence from fact witnesses and experts about deceptive conduct and losses attributable to such conduct. Among other things, the BPI's expert testified that his damages models assumed "liability is found" and parsed "which sales attributed to the breach." The expert provided various calculations depending on the legal theory asserted, accounting for product similarity and dissimilarity when including and excluding units. BPI's counsel during oral argument characterized the damages between the counterclaims as "cumulative," although not "apportioned." Still, rather than concede that the expert failed to distinguish between the counterclaims, as the majority contends, BPI's counsel stated that the jury "had ample information to segregate the damages from breach of contract and the damages from unfair competition."

Bars fails to persuade that the record compels the singular conclusion that more particularized evidence is required to prove unfair competition. Neither Bars nor the majority

cites case law requiring a separate jury argument on damages for each cause of action, as opposed to one lump sum request. *See Pa. R.R. Co. v. McKinley*, 288 F.2d 262, 267 (6th Cir. 1961) (declining to adopt a "procedural blueprint" for arguments about damages). And even if such case law was extant in some form, Bars did not preserve the argument that the jury was improperly instructed on how to calculate damages. On a verdict form with separate line items for each cause of action, the jury was asked, "State the amount of damages, if any, that you find were caused by Plaintiff Bars competing unfairly with Defendants." The district court reminded the jury that "[b]reach of contract does not constitute unfair competition," and that any consideration of unfair competition should be resolved "separately from a breach of contract between the parties." During deliberations, the jury took the instructions in earnest by requesting a calculator and copies of expert trial exhibits. Considering a request of $2,815,062 in damages—in addition to future damages of $8,327,433—the jury awarded $974,849 in view of evidence presented at trial, none of which Bars argues on appeal was inadmissible.

The jury's verdict on unfair competition should not be disturbed. The trial court concluded as much: "The Court finds that the jury's damages award are within the range of evidence presented at trial in light of testimony presented by BPI's fact and expert witnesses." *Bar's Prods. v. Bar's Prods. Int'l*, No. 10-14321, 2015 U.S. Dist. LEXIS 130660, at *11 (E.D. Mich. Sept. 29, 2015). On the record before us and standard of review to which we must adhere, we should not reverse that conclusion. For these reasons, I respectfully dissent in part and would affirm the district court's denial of judgment as a matter of law on Bars's counterclaim for unfair competition.